STATE of Wisconsin, Plaintiff-Respondent,

v.

Allen Dell VAUGHN, Defendant-Appellant.†

Court of Appeals

*No. 2012AP94–CR. Submitted on briefs October 2, 2012.*
*—Decided October 30, 2012.*

2012 WI App 129

(Also reported in 823 N.W.2d 543.)

† Petition for Review filed 11-29-12.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Allen Dell Vaughn appeals the judgment entered after a jury found him guilty of attempted first-degree intentional homicide while armed for the stabbing of his mother's boyfriend. *See* WIS. STAT. §§ 940.01(1)(a), 939.63, & 939.32.[1] The trial court sentenced him to a bifurcated sentence of thirty-five years, consisting of twenty years of initial confinement followed by fifteen years of extended supervision. *See* WIS. STAT. § 973.01. Vaughn also appeals the order denying his motion for postconviction relief. He claims that he: (1) did not "knowingly and intentionally waive[] his constitutional right to be present in court at his trial"; and (2) did not "knowingly, voluntarily and intentionally waive[] his constitutional right to testify at his trial." He also contends that: (1) in sentencing him, the trial court "relied on inaccurate information regarding" his "mental health"; and (2) "the postsentencing diagnosis" of his "psychosis constitutes a new factor justifying sentence modification." We affirm.

---

[1] The Honorable Clare L. Fiorenza presided over the trial and entered the judgment. The Honorable Mel Flanagan denied Allen D. Vaughn's motion for postconviction relief.

## I.

¶ 2. Vaughn was accused of stabbing his victim in the end of August, 2006. His trial lawyer was appointed to represent him in early September, 2006. Testifying at the postconviction hearing, the trial lawyer said that early in his representation he was able to have "intelligent discussions" with Vaughn "regarding some of the facts regarding the incident": "There were a number of conversations that, quite frankly, were perfectly fine and we discussed the case before the competency issues began to crop up." Nevertheless, those issues did crop up because a week before the scheduled May, 2007, trial date, his trial lawyer told the trial court, the Honorable Frederick C. Rosa, presiding, at a scheduling conference at which Vaughn was not present that he "was very concerned about [Vaughn's] ability to communicate with me in any rational and intelligent manner."[2] Further, the lawyer reported that Vaughn "basically refused to come out of his [jail] cell" and would not meet with a psychologist the lawyer had hired. The lawyer asked the trial court to order "an inpatient examination" to determine whether Vaughn was competent. The trial court ordered the evaluation, which was done at the Mendota Mental Health Institute. The examining psychiatrist found that Vaughn was competent: "[I]t is my opinion to a reasonable degree of medical certainty that Allen D. Vaughn does not lack substantial mental capacity to understand the proceedings and assist in his defense at the present time." He noted, however, that Vaughn had

---

[2] We do not ordinarily identify trial judges in the body of an opinion. But, as we will see, many judges had a piece of this matter in the circuit court. Once identified, that judge handled all subsequent matters, unless and until we indicate that the matter was before another judge.

an "Adjustment Disorder with Depressed Mood," which the psychiatrist attributed to the stress of Vaughn's pretrial incarceration. The psychiatrist recommended that Vaughn's condition be re-assessed if he should regress:

> While Mr. Vaughn appears depressed, this does not cause him to be unmotivated or uninterested in obtaining a favorable outcome. He does not appear to suffer from symptoms of severe depression, but he is at risk for this to occur. It is possible that the stress of a trial or extended confinement could result in future psychiatric instability, but this event is not specifically predicted. Mr. Vaughn has a number of risk factors for suicidal behavior in the context of depression. I suggest that the Court remain vigilant to behavioral changes and consider reassessment at a future date should deterioration of his condition be suspected.

¶ 3. At another pre-trial conference some five months later before the Honorable Clare L. Fiorenza, Vaughn's lawyer told the trial court that he again had "an issue regarding the defendant's competency." Vaughn was at this conference. The trial court ordered another inpatient competency evaluation. As with the earlier psychiatric evaluation, the psychologist who examined Vaughn at the Winnebago Mental Health Institute concluded in a January 25, 2008, report that he was competent:

> Based on my examination, it is my opinion, to a reasonable degree of psychological certainty, that Mr. Vaughn is competent to proceed. Mr. Vaughn was able to demonstrate that he has the capacity to understand the proceedings and assist in his defense. At this time, there is no evidence to suggest that he experiences symptoms of mental illness that could interfere with his abilities relative to competency.

Significantly, the psychologist related in her report Vaughn's ability to lucidly respond to her questions:

> I believe Mr. Vaughn understood the nature of the evaluation, his right to refuse, and the limits of confidentiality. He stated, "Yes, Ma'am, I know you're going to figure out how I think, and tell the court. I also know that I have the right not to participate, remain silent, all that. You want to make sure I can answer questions about court and have independent ability to decide about my case."

> . . .

> Mr. Vaughn reported that he does not believe he is mentally ill. He added that he does not believe he needs to be hospitalized in a mental institution. When asked why he thinks the question of competency was raised, he stated, "Maybe because I'm black. No, that's just a joke. I don't know why. I'm not angry, but want to get out."

¶ 4. Vaughn's trial lawyer did not accept the psychologist's conclusion that Vaughn was competent, and the trial court held an evidentiary hearing at which the psychologist testified. Vaughn was at this hearing. When asked whether he read the psychologist's report, Vaughn several times merely responded that he was not guilty "of attempted homicide." The trial court turned to Vaughn's lawyer:

> THE COURT: Have you reviewed it with Mr. Vaughn, also?

> (Defendant mumbling loudly.)

> THE COURT: Sir—

> [Vaughn's trial lawyer]: I read it word for word to him.

> THE COURT: Is that correct, Mr. Vaughn?

■

THE DEFENDANT: Yes.

THE COURT: [Assistant district attorney], you had an opportunity to review that report?

[Vaughn's trial lawyer]: Yes.

THE COURT: Mr. Vaughn—

THE DEFENDANT: I plead not guilty on the ground of attempted homicide.

THE COURT: Mr. Vaughn, listen to me, sir.

THE DEFENDANT: The report—

THE COURT: Mr. Vaughn, we have—

THE DEFENDANT: I haven't— In this case—

THE COURT: Mr. Vaughn, you will be removed from the courtroom if he [sic] doesn't be quiet. We have a few rules in this courtroom, sir. When I talk, you don't.

Mr. Vaughn, with respect to the report, the report indicates you're competent to proceed. Do you believe you're competent, sir?

THE DEFENDANT: Not guilty on the grounds of attempted homicide.

THE COURT: Sir, I will say this one more time. Do you believe that you are competent, sir?

All right. The defendant is standing silent, the record should reflect.

¶ 5. The psychologist testified and reiterated her report's conclusions. In response to cross-examination by Vaughn's trial lawyer, she painted a picture of a defendant able to respond appropriately:

Q. Did he appear able to converse with you during the hour and a half you met with him?

A. Yes, he did.

Q. Did he exhibit episodes of bizarre behavior?

A. No, not during the course of my evaluation he did not.

Q. At any time during your evaluation did he lapse into any type of incoherent shouting?

A. No, he did not.

Vaughn's trial lawyer then asked the psychologist about Vaughn's "responses" to the trial court's questions that the lawyer characterized as "not pertinent to the judge's questions": "Was there any time during your interview of him that he exhibited the same type of behavior where his answers were completely non pertinent to the question asked?" The psychologist said: "No, there was not a time." She also said that as far as she knew, Vaughn, in the words of Vaughn's trial lawyer, is "able to interact adequately with the staff and other patients." Vaughn's trial lawyer also asked if "there is any recognized mental, psychiatric or psychological condition which would render one incompetent in the courtroom yet competent outside the courtroom?" The psychologist responded that she was not "aware of" any, noting "[t]hat would suggest malingering I think, but I have to have more time and more information to evaluate something like that." When Vaughn's trial lawyer asked whether "[a]t any point in time did Mr. Vaughn seem to indicate that he did not understand what was happening in any of his court appearances that he's been at?" the psychologist said, "No, he did not." The trial court found Vaughn competent. Vaughn's appeal does not challenge this contemporaneous finding, except insofar as the appeal contends that Vaughn's developing mental illness prevented him from "knowingly and intentionally" giving up his rights.

¶ 6. Vaughn's trial began on March 12, 2008, and had a troubling start. First, although Vaughn's mother brought his street clothes to the courtroom, Vaughn refused to wear them. The trial court asked him, "Mr. Vaughn, would you like to put some regular clothes on, or did you want to proceed to trial with the jail garb, sir?" Vaughn responded, "I'll stay in this." Second, after the trial court warned Vaughn that if he was disruptive, it would "have no option but to have you removed. Do you understand that, sir?" and Vaughn responded, "Yes. Yes, ma'am," he said, "Let's just do a plea right now." The trial court asked, "You want to enter a plea?" and Vaughn said, "Yes." The trial court then asked Vaughn's trial lawyer about "the status of any discussions":

> [Vaughn's trial lawyer]: I don't think that's—
>
> THE DEFENDANT: I'll take a plea on the record right now. I'm not guilty on the grounds of attempted homicide.
>
> THE COURT: Sir, I can't hear what you're saying. Do you want to enter a plea to the charge before the Court?
>
> [Vaughn's trial lawyer]: No. He wants to do the same thing he's been doing, which is to say he's not guilty.

The trial court then explained that they were "going to proceed to trial." Vaughn interrupted: "I'm not guilty on the grounds of attempted homicide. If guilty, it's insanity to be sent to electronic supervision."[3] This followed:

> THE COURT: I'm asking you to be quiet.

---

[3] As will be made a bit clearer later on, it appears that Vaughn was saying that he was not guilty by reason of insanity, and that he should be placed on electronic monitoring.

The record should reflect that Mr. Vaughn is yelling and has a raised voice, and he is talking loudly.

THE DEFENDANT: I'm not guilty of attempted homicide. It's insanity and electronic supervision in this case. That's all I want to say.

THE COURT: Are you done, sir?

THE DEFENDANT: Yes, judge.

THE COURT: Okay. You're not going to interrupt me again, sir?

THE DEFENDANT: Not gonna interrupt no more.

THE COURT: Not going to interrupt no more. All right.

Vaughn interrupted again about a page later in the transcript, however, during his lawyer's discussion with the trial court about defense motions:

THE DEFENDANT: It's insanity.

THE COURT: — the defendant would have a right to put forth —

THE DEFENDANT: See, my attorney, Attorney Bohach, it's insanity.

THE COURT: Mr. Vaughn, I'm going to ask you to please be quiet again. If you aren't, sir, you're going to get removed from this courtroom — it's kind of sad — before the jury even —

THE DEFENDANT: Can I be removed from this courtroom?

THE COURT: Sir, I'm going to tell you.

THE DEFENDANT: It's insanity, not no self-defense. That's what I'm arguing on. If its guilty, the complete sentence to try the supervision. It's a case of proof on the grounds.

This continued, and Vaughn repeated that he was not guilty but wanted "some electronic supervision." In connection with his lawyer's representation to the trial court that the defense had explored but rejected a not-guilty-by-reason-of-mental-disease-or-defect plea, Vaughn repeated: "I'm not guilty on the grounds of attempted homicide, I argue on the grounds if [*sic*—of?] not guilty, insanity," and that he wanted "some electronic supervision." The trial court again warned Vaughn not to interrupt, and, as before, he promised to comply:

> THE COURT: Do you agree to act properly in this courtroom, sir?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that if there's another outburst, you will be removed from this courtroom.
>
> THE DEFENDANT: Yes.

¶ 7. Later at the session, Vaughn said that he wanted a bench rather than a jury trial. The trial court indicated that it "would have to think about that, if it's appropriate to do so," because, as it noted, "I think maybe it's best to have the citizens of Milwaukee County make this determination 'cause the Court has to agree to a — a jury waiver also." Vaughn replied, "Take your time."

¶ 8. The trial court and the lawyers then discussed pre-trial matters, and the State sought an *in limine* order "specifically prohibiting the defendant and Defense in general from making any sort of not guilty by mental disease or defect-type argument during this trial" because Vaughn was not asserting such a plea but his outbursts, the State argued, might be a backdoor approach. The trial court granted the State's motion and

777

ruled: "There shall be no testimony, no assertions, no outbursts with respect to any type of insanity defense in this case." This followed:

THE DEFENDANT: I know this — I said I object on the grounds. I'd like to outburst one more again.

THE COURT: Mr. Vaughn.

THE DEFENDANT: I'm just talking.

THE COURT: You're going to get removed, sir.

The record should reflect Mr. Vaughn is being boisterous in this courtroom, trying to talk over his counsel.

THE DEFENDANT: This is what my courtroom — my own voice. You gonna take my insanity or what? I say I'm not guilty.

THE COURT: Mr. Vaughn, this is my last warning. Sir, I suggest you be quiet. This is your final warning, sir. If there's another outburst, you will be removed. Do you understand, sir?

The record should reflect I'm trying to be as — very patient with Mr. Vaughn. I'm trying to give him as many possible opportunities.

THE DEFENDANT: I just outburst. Look at the cases on the table.

THE COURT: The record should reflect he's interrupting me again, and he's being removed from the courtroom.

Mr. Vaughn, when you act properly, you shall be returned.

¶ 9. That afternoon, the trial court and the lawyers discussed a new development—Vaughn's lawyer told the trial court and the State that Vaughn "is refusing to leave the jail to come to court." The trial

778

court confirmed that the deputies reported that as well. Vaughn's lawyer then went to the jail and later reported that Vaughn emphatically did not want to come to court. The trial court was able to arrange an audio/video hookup, and, on that too, Vaughn said several times that he did not want to come to court, even though the trial court explained that he had a constitutional right to do so and "to face the people who are accusing him." He also repeated that he did not want a jury trial, but, rather, "would like Branch 3 to judge me without 12 jurors."

¶ 10. The trial court rejected Vaughn's request for a bench trial, noting that it did not believe that it could "proceed with a proper waiver of a jury trial," given the difficulties they were having in communicating over the audio/video hookup. It noted, though, "I would be willing to try to do that if Mr. Vaughn wants to come to court so I can hear him." Vaughn refused to come to court, however. The State asked Vaughn if he heard the trial court and the trial court's explanations of his constitutional rights. Vaughn answered, "Yes," and repeated, "I do not want to be present in this courtroom."

¶ 11. Vaughn's lawyer again raised the issue of Vaughn's competency, contending that Vaughn "couldn't waive anything because he's not putting two sentences together that make any sense whatsoever in terms of legal reasoning." The State opposed the request for a new competency evaluation, arguing that "refusing to participate in the process is not the same as not being competent to stand trial," and that all the evaluations showed that Vaughn was competent. The trial court declined to order a new evaluation. Vaughn does not challenge that ruling on this appeal.

¶ 12. Jury selection continued the following morning, and Vaughn not only refused to come to court, but also refused to watch and listen *via* the audio/video

hookup. His lawyer recounted his face-to-face meeting with Vaughn at Vaughn's jail cell that morning: "I asked him if he wanted to stay in his cell for the rest of the trial and not participate, and he clearly said, 'Yes, that's what I want to do.' He said, 'Yes.' " Vaughn's trial lawyer also said that he told Vaughn "that if at any time he wishes to participate in the trial that all he needs to do is to notify the deputy on his pod." Further, Vaughn's trial lawyer said that "based upon eighteen months of representing Mr. Vaughn, it is absolutely clear that he wishes to take no part whatsoever in this process." Vaughn's trial lawyer also rejected any suggestion that Vaughn be brought to court forcefully:

> [A]s a Defense counsel, I, obviously, would not sign onto that option since it would lead to additional charges for my client. So, no matter how precious his right to be in trial, I don't think that it would be of any value to him to end up with additional potential charges and, obviously, injuries to himself or deputies just to sit and watch this, when he's made it so clear that he doesn't want to.

The trial court recognized the reality of Vaughn's obstinacy: "I'm finding that the defendant is refusing to participate in the trial, that he clearly understands his rights and his right to be present. By his own actions, the statements, he's waiving that right, and he can reclaim that right at any time he so chooses." Based on what we have seen at some length, these findings are fully supported by the Record and are not, by any stretch of the imagination, "clearly erroneous." *See* WIS. STAT. RULE 805.17(2) (circuit court's findings of fact must be upheld on appeal unless "clearly erroneous"), made applicable to criminal proceedings by WIS. STAT. § 972.11(1). As we have seen, and as we discuss in the next part, Vaughn's appeal contends that the trial

court's finding that Vaughn voluntarily relinquished his right to be at the trial is flawed because of what Vaughn contends on appeal, was his mental illness.

¶ 13. After the State rested its case-in-chief, Vaughn's trial lawyer reported that he had discussed with Vaughn his right to testify: "[H]e was very adamant that he did not wish to testify and that he did not wish to appear either by video or in person." Vaughn's trial lawyer also told the trial court that based on many discussions he had with Vaughn over the course of his representation, Vaughn's consistent position was that he did not want to testify at any trial even though, according to Vaughn's trial lawyer, "[h]e understands his rights": "I am satisfied he has no intention of coming to court. He has no intention of testifying. He has no intention of doing this by video. He has an intention of staying in his cell and abiding by the verdict of the jury and the judgment of the court." The trial court found that Vaughn "has freely, voluntarily, intelligently made this decision." Vaughn's appeal contends that the trial court's finding that Vaughn voluntarily relinquished his right to testify is flawed because the trial court did not personally discuss that matter with Vaughn, and, also, that Vaughn's mental state prevented him from legally waiving that right. Vaughn's trial lawyer, however, testified that at the postconviction hearing that he believed that Vaughn knew what was happening: "I felt that he understood exactly what was going on."

¶ 14. On April 30, 2008, the trial court sentenced Vaughn to a bifurcated sentence of thirty-five years' imprisonment consisting of twenty years of initial confinement followed by fifteen years of extended supervision. *See* WIS. STAT. § 973.01. Vaughn was in court, but again acted up and made some non-responsive comments, although when the trial court asked him

whether he had gone over the pre-sentence report with his lawyer, he said that he had. When the trial court asked him if he had "any changes, additions, or corrections to that report," Vaughn replied, "No." Nevertheless, Vaughn interrupted the State's sentencing recommendation, and asked: "They found me guilty already?" Later, also during the State's sentencing recommendation, Vaughn interrupted:

> THE DEFENDANT: Yes. My recommendation is one year initial confinement and probation felony —
>
> THE COURT: Mr. Vaughn.
>
> THE DEFENDANT: — on the grounds that —
>
> THE COURT: Mr. Vaughn.
>
> THE DEFENDANT: Yes?
>
> THE COURT: I'm asking you to be quiet. You'll have a moment to speak to the Court in a minute.
>
> THE DEFENDANT: I won't talk no more. I quit.

True to his word, Vaughn did not speak again during the sentencing hearing, even when the trial court addressed him directly.

¶ 15. Once at prison, Vaughn had to be seen by a prison psychiatrist. The psychiatrist's report, dated May 22, 2008, indicated that Vaughn had a "Psychotic Disorder NOS" (not otherwise specified), but did not recommend any "psychiatric medications at this time." At a later court hearing, another psychiatrist explained: "Psychotic disorder not specified is a diagnosis that we give to an individual who is manifesting symptoms of psychosis, but we did not yet have information or longitudinal data to provide a more specific diagnosis." In December, Vaughn was at the Wisconsin Resource Center in Winnebago County, and the Center recommended

782

that Vaughn be committed "for treatment pursuant to [Wis. Stat.] 51.20(1)(ar)" (civil commitment of a "mentally ill" prisoner in need of treatment where "appropriate less restrictive forms of treatment have been attempted with the individual and have been unsuccessful"). Vaughn was committed.

¶ 16. In the midst of postconviction proceedings on Vaughn's behalf, the trial court, at the request of Vaughn's postconviction lawyer, ordered that Vaughn be reexamined to see if he was competent to seek postconviction relief. *See State v. Debra A.E.*, 188 Wis. 2d 111, 126, 523 N.W.2d 727, 732 (1994) (A defendant seeking postconviction relief must be competent.). The psychiatrist who examined Vaughn concluded in his report that Vaughn was not competent, but that he "could be restored to competency with medications." The psychiatrist testified at the hearing, and both the State and Vaughn's postconviction lawyer agreed with his assessment, although Vaughn, who was in court, did not. The circuit court, the Honorable Mary Kuhnmuench, presiding, found Vaughn to be not competent to pursue postconviction relief.

¶ 17. In a report dated, December 17, 2009, the psychiatrist opined that Vaughn "has been restored to competency." At a January 19, 2010, hearing, neither the State nor Vaughn's postconviction lawyer contested the psychiatrist's conclusion.

¶ 18. The psychiatrist testified at an October 10, 2011, hearing before the circuit court, the Honorable Mel Flanagan, presiding, in connection with Vaughn's postconviction relief requests. He opined that Vaughn had been suffering from a mental illness that developed over time and that the psychiatrist had not yet come up with what the circuit court referred to as a "final diagnosis." Although the psychiatrist indicated that in

783

his view Vaughn "was manifesting symptoms of psychosis" at the trial, he could not say, in response to a question by the circuit court that Vaughn's behavior at the trial "was not voluntary." He added, again in response to a question by the circuit court, that he could not say "to a reasonable medical certainty that [Vaughn] wasn't making an informed decision or not," and that he could not say that Vaughn was *not* making an informed decision. Later, during cross-examination by the State, the psychiatrist opined "[y]ou can understand even though you have a mental illness."

> Q And just because someone's exhibited signs or symptoms of a mental illness does not mean they aren't fully aware of what they're doing?
>
> A It doesn't.
>
> Q So if Mr. Vaughn was exhibiting symptoms of a psychosis during the trial or the dates immediately before the trial and immediately after, it doesn't mean he didn't understand what he was doing?
>
> A A It does not necessarily mean he did not understand.

¶ 19. As we noted, Vaughn's trial lawyer testified at the postconviction hearing. Before he testified, however, the State raised the issue of whether the trial lawyer's testimony might breach Vaughn's attorney/client privilege. This followed:

> [Vaughn's postconviction and appellate lawyer]: It's my understanding [Vaughn] is willing to waive that for this narrow purpose only, but if you want to hear it from Mr. Vaughn —
>
> THE COURT: Okay. Sir, is that — Have you been following the conversation?

THE DEFENDANT: I agree.

THE COURT: Okay. That some of the things that they may ask your attorney — your former attorney on the stand under oath may go into areas of communications between you and him that would otherwise be private or privileged. You understand that?

THE DEFENDANT: Yes.

THE COURT: But if they are on point for the issues that you raised in your appeal and the only way we can examine those issues is to go into those areas, would you agree to waive those — the privilege to those continuing conversations so that he, the attorney, can fully testify on them?

THE DEFENDANT: I agree.

THE COURT: Okay. Any question about that, sir?

THE DEFENDANT: No.

Despite Vaughn's appellate contentions that his developing mental illness made his decisions to not come to court and to not testify not knowing and intentional, Vaughn does not challenge on this appeal his attorney/client-privilege waiver at the postconviction hearing.

¶ 20. The circuit court denied Vaughn's request for postconviction relief in a written decision. It determined that the trial court properly accepted the conclusions of the inpatient mental-health examiners that Vaughn was competent, and, therefore, Vaughn was able to and did waive his right to participate in the trial. Further, the postconviction court determined that Vaughn's refusal to participate in the trial prevented the trial court from conducting "an on-the-record colloquy with the defendant concerning the right to testify." It found that

Vaughn's trial lawyer "fully" discussed the right to testify with him and that the "record is clear that the defendant was fully informed of his right to testify by counsel and was intentionally waiving this right." The postconviction court also determined that the trial court did not base its sentence of Vaughn on inaccurate information, and that the post-sentencing mental evaluations did not warrant modifying Vaughn's sentence. We affirm for the reasons explained below.

## II.

### A. *Vaughn's presence at his trial.*

The Confrontation Clause and the Fourteenth Amendment grant an accused the right to be present in the courtroom at every stage of his or her trial. Although an accused has the constitutional right to be present at trial, he or she may lose this right by misconduct or consent. A waiver occurs when there is "an intentional relinquishment or abandonment of a known right or privilege."

*State v. Divanovic*, 200 Wis. 2d 210, 219–220, 546 N.W.2d 501, 504–505 (Ct. App. 1996) (citations and quoted source omitted).[4] We review *de novo* the ultimate legal issue (often called a "constitutional fact") of

---

[4] WISCONSIN STAT. § 971.04(1) essentially tracks the formulation in *State v. Divanovic*, 200 Wis. 2d 210, 219 & 219 n.4, 546 N.W.2d 501, 504 & 504 n.4 (Ct. App. 1996), which referenced it, and provides that every "defendant shall be present: (a) At the arraignment; (b) At trial; (c) During voir dire of the trial jury; (d) At any evidentiary hearing; (e) At any view by the jury; (f) When the jury returns its verdict; (g) At the pronouncement of judgment and the imposition of sentence; (h) At any other proceeding when ordered by the court." (Formatting altered.). The statute recognizes two exceptions. First, where a defendant in a misdemeanor case authorizes his or her lawyer to appear in

whether Vaughn was deprived of his right to attend his trial and participate. *See id.*, 200 Wis. 2d at 220, 546 N.W.2d at 505. We review any underlying facts (the "historical facts"), however, with great deference to the circuit court's ability to assess the witnesses. *See State v. Anagnos*, 2012 WI 64, ¶ 21, 341 Wis. 2d 576, 586, 815 N.W.2d 675, 680 (historical facts are sustained on appeal unless they are "clearly erroneous").

¶ 21. There are thus two forks in the road of a defendant's non-appearance at his or her criminal trial: (1) waiver and (2) forfeiture. As *Divanovic* tells us, "waiver" is the " 'intentional relinquishment or abandonment of a known right or privilege.' " *Divanovic*, 200 Wis. 2d at 220, 546 N.W.2d at 505 (quoted source omitted), *see also State v. Ndina*, 2009 WI 21, ¶ 29, 315 Wis. 2d 653, 670, 761 N.W.2d 612, 620 (" '[W]aiver is the intentional relinquishment or abandonment of a known right.' ") (quoted source omitted). "Forfeiture," too, has two aspects: (1) the failure to object to something without intending to relinquish that which an objection might have preserved, *ibid.*, (" '[F]orfeiture is the failure to make the timely assertion of a right.' "), and (2) doing something incompatible with the assertion of a right, *see*

---

his or her stead, and the court approves—§ 971.04(2). Second, as material here:

> If the defendant is present at the beginning of the trial and thereafter, during the progress of the trial or before the verdict of the jury has been returned into court, voluntarily absents himself or herself from the presence of the court without leave of the court, the trial or return of verdict of the jury in the case shall not thereby be postponed or delayed, but the trial or submission of said case to the jury for verdict and the return of verdict thereon, if required, shall proceed in all respects as though the defendant were present in court at all times.

§ 971.04(3).

*Illinois v. Allen,* 397 U.S. 337, 343 (1970) (disruption after warning). *Allen* has given us the commonsense, black-letter rule:

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

*Ibid.* (Footnote omitted). This, of course, is precisely what we have in this case; the trial court was exceedingly patient and solicitous, and Vaughn refused to heed its warnings, and had to be removed from the courtroom. But there is more: Vaughn then expressly said that he did not want to participate in his trial, and he said this many times despite the attempts by the trial court and his lawyer to get him to change his mind. As we have seen, Vaughn's appeal argues that he was too mentally ill to make that decision "knowingly and intentionally." But, as we have also seen, the trial court expressly found that Vaughn was competent, and we now turn to this aspect.

¶ 22. WISCONSIN STAT. § 971.13(1) provides: "No person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." *See also Godinez v. Moran,* 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless

he is competent."); *State v. Byrge*, 2000 WI 101, ¶ 26, 237 Wis. 2d 197, 213, 614 N.W.2d 477, 484 ("Competence to stand trial is a cornerstone of our criminal justice system. Anglo-American law long has recognized that incompetent defendants cannot be compelled to stand trial.") (internal citation omitted). Defendants who have been found to be competent may do things during the course of their prosecution and trial that others might deem self-defeating, foolish, or even foolhardy. *See Godinez*, 509 U.S. at 398–400 (setting out the various decisions that a competent defendant may have to make, either in trial or, the issue presented by *Godinez*, in discharging lawyers and pleading guilty).

¶ 23. WISCONSIN STAT. § 971.14 establishes the procedures for determining whether a defendant is or is not competent, and § 971.14(1r)(a) imposes the following requirement: "The court shall proceed under this section whenever there is reason to doubt a defendant's competency to proceed." When a defendant's competency is thus in issue and competency or lack of competency is not conceded by all the parties, the State must prove that the defendant is competent "by the greater weight of the credible evidence." § 971.14(4)(b). A circuit court's finding under this section is one of historical fact and may not be set aside on appeal unless it is "clearly erroneous." *Byrge*, 2000 WI 101, ¶ 4, 237 Wis. 2d at 205, 614 N.W.2d at 481 ("The findings of a circuit court in a competency to stand trial determination will not be upset unless they are clearly erroneous because a competency hearing presents a unique category of inquiry in which the circuit court is in the best position to apply the law to the facts.").

¶ 24. Here, of course, the trial court found Vaughn competent, and, given the Record before it, including the

psychiatric and psychological reports, and the evidence adduced at the competency hearing, a contention, *which Vaughn does not make on appeal,* that the trial court's finding that the State had proven him competent was "clearly erroneous" would border on the frivolous. Vaughn's appeal takes a more subtle approach: it contends that though competent, Vaughn's decision to absent himself from the trial was not knowing or intentional because of the overlay of his developing mental illness. But this argument ignores the line drawn by *Godinez* when it observed that, for example, "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." *Godinez,* 509 U.S. at 400 (emphasis in orginal). Of course, *even a competent defendant* may not be permitted self-representation unless: "the defendant: (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him, and (4) was aware of the general range of penalties that could have been imposed on him." *State v. Klessig,* 211 Wis. 2d 194, 206, 564 N.W.2d 716, 721 (1997). But, significantly, being able to represent oneself is different than general competency to be tried because self-representation requires deeper levels of skill and understanding than does mere competency. *Godinez,* 509 U.S. at 400. Although Vaughn might not have been able to represent himself at his trial, a matter that we do not decide, he has not shown that he was not fully able to decide whether to participate in his trial or, as he did, endeavor to obstruct it. Indeed, as we have seen, his psychiatric witness at the postconviction hearing admitted that he could not say that Vaughn's obstructions and refusals to participate in his trial "was not voluntary," and that what the psychiatrist said was

Vaughn's developing mental illness did "not necessarily mean he did not understand" what he was doing.

B. *Vaughn's decision to not testify.*

¶ 25. Every defendant in a criminal case has the "fundamental" constitutional right to testify on his or her behalf. *State v. Weed*, 2003 WI 85, ¶ 37, 263 Wis. 2d 434, 461, 666 N.W.2d 485, 497–498. Accordingly, "a circuit court should conduct a colloquy with the defendant in order to ensure that the defendant is knowingly and voluntarily waiving his or her right to testify." *Id.*, 2003 WI 85, ¶ 40, 263 Wis. 2d at 463, 666 N.W.2d at 498. Here, "the waiver must be 'an intentional relinquishment or abandonment of a known right or privilege.' " *Ibid.* (one set of internal quotation marks and quoted source omitted). "The colloquy should consist of a basic inquiry to ensure that (1) the defendant is aware of his or her right to testify and (2) the defendant has discussed this right with his or her counsel." *Id.*, 2003 WI 85, ¶ 43, 263 Wis. 2d at 464, 666 N.W.2d at 499. *Weed* noted that "requiring circuit courts to conduct an on-the-record colloquy to ensure that a criminal defendant is making a knowing, intelligent, and voluntary waiver of his or her right to testify will not be significantly burdensome." *Id.*, 2003 WI 85, ¶ 42, 263 Wis. 2d at 464, 666 N.W.2d at 499. Of course, *Weed* did not address the situation here, where a defendant prevents the trial court from conducting the "on-the-record colloquy" it required. When a trial court defaults in its obligation to conduct the on-the-record colloquy, there may be a retrospective "evidentiary hearing to determine whether [the defendant] knowingly, voluntarily

and intelligently waived the right to testify." *State v. Garcia*, 2010 WI App 26, ¶ 4, 323 Wis. 2d 531, 535, 779 N.W.2d 718, 720.

¶ 26. As we have seen, however, a defendant in a criminal case may lose fundamental rights (such as the right to appear at the trial and confront the accusers) when the defendant forfeits those rights by interfering with the ability of the trial court to protect those rights. *See Allen*, 397 U.S. at 343; *see also Taylor v. United States*, 414 U.S. 17, 20 (1973) *(per curiam)*; *Fischetti v. Johnson*, 384 F.3d 140, 151 (3rd Cir. 2004) ("Through misconduct, defendants can outright forfeit trial rights as fundamental as the Sixth Amendment right to counsel."). By refusing to come to court so the trial court could personally explain what *Weed* requires must be explained, Vaughn made it, as a practical matter consistent with safety, impossible for the trial court to explain his right to testify, and determine whether his decision to not testify was, in *Weed*'s phrase, "knowing, intelligent, and voluntary." Indeed, we have seen how when the trial court discussed with the State and Vaughn's trial lawyer the possibility of having the courthouse deputies forcibly bring Vaughn into court, Vaughn's trial lawyer objected. We reprint what the lawyer said because it bears significantly on how far circuit courts must go to comply with the palliative *Weed* requirements:

> [A]s a Defense counsel, I, obviously, would not sign onto that option since it would lead to additional charges for my client. So, no matter how precious his right to be in trial, I don't think that it would be of any value to him to end up with additional potential charges and, obviously, injuries to himself or deputies just to sit and watch this, when he's made it so clear that he doesn't want to.

This warning makes even more sense given the lawyer's testimony at the postconviction hearing that Vaughn "is a pretty big guy." Vaughn gave the trial court no choice but to forego what it wanted to do in order to ensure that his decision to not testify was knowing and voluntary.[5] He cannot now complain, and we will not impose on the circuit courts a rule that not only would be pyrrhic in the sense that if an obstreperous defendant is dragged into court and still does not cooperate, dragging that defendant into court accomplishes nothing, but would also endanger everyone including the defendant.

C. *Trial court's alleged reliance on inaccurate information in sentencing Vaughn.*

¶ 27. There is no doubt but that: "[a] defendant has a constitutionally protected due process right to be sentenced upon accurate information." *State v. Tiepelman*, 2006 WI 66, ¶ 9, 291 Wis. 2d 179, 185, 717 N.W.2d 1, 3. "A defendant who requests resentencing due to the circuit court's use of inaccurate information at the sentencing hearing 'must show both that the information was inaccurate and that the court actually relied on the inaccurate information in the sentencing.' " *Id.*, 2006 WI 66, ¶ 26, 291 Wis. 2d at 192–193, 717

---

[5] Accordingly, we do not have to consider whether the State proved at the postconviction hearing under *State v. Garcia*, 2010 WI App 26, ¶ 9, 323 Wis. 2d 531, 537–538, 779 N.W.2d 718, 720–721, that Vaughn "waived" (that is, intentionally relinquished a known right) his right to testify. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed); *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").

N.W.2d 1, 7 (one set of internal quotation marks and quoted source omitted). Our review is *de novo*. *See id.*, 2006 WI 66, ¶ 9, 291 Wis. 2d at 185, 717 N.W.2d at 3.

¶ 28. Vaughn hangs his hat on the report and testimony at the postconviction hearing by the psychiatrist who said that Vaughn had been developing a mental illness, which was in its incipient stages during the trial. Vaughn has not, however, shown that the trial court viewed him as wholly without mental illness or "actually relied" on Vaughn's mental health in imposing sentence.

¶ 29. First, the trial court fully articulated why it believed that a substantial sentence was warranted: It viewed Vaughn's crime as "incredibly serious," noting not only that the victim was not hurting Vaughn's mother when Vaughn attacked him, but also that Vaughn inflicted "substantial injuries" on the victim: "He was stabbed, I believe, in the stomach, in the lung, the back of the head, his left eye. I believe there was damage to his adrenal gland, to his chest, to his abdomen, to his diagram [*sic*—diaphragm], to his liver." Vaughn does not contend that his victim did not suffer these serious injuries. Further, the trial court recalled that Vaughn's mother testified at the trial that he "stopped stabbing [the victim] because [Vaughn] thought he had hurt her, and that's, I think, the only reason why he stopped stabbing [the victim]." The trial court opined that its "gut reaction is that he would have killed [the victim] had not his mother intervened." It appraised Vaughn as "a very violent individual who is a very huge danger to our society." Vaughn does not contend that any of this is not accurate.

¶ 30. Second, the trial court considered that Vaughn, although only twenty-two when sentenced,

had a lengthy criminal history: "a juvenile for a battery"; two "fourth-degree sexual assault" convictions; non-compliance with supervision while on probation; and that Vaughn repeatedly stabbed his mother's boyfriend while he was on probation. Vaughn does not contend that any of this is not accurate.

¶ 31. Third, the trial court noted that Vaughn "completed tenth grade. He doesn't have education. He has a lot of issues that need to be addressed — addressed. He has drug issues in the past that he has to address." It also reflected that Vaughn had been in an accident when he was "four or six years old" and that may have been the cause of what the trial court described as Vaughn's "learning disabilities."

¶ 32. The trial court also referred to supportive letters it received from "family members," but opined that it did not "know the person they're talking about in those letters. I haven't seen that side of him." The trial court did note, though, that the letters were "sad" because "there must be another side to this individual that is — is hidden very, very deeply within him." Based on this, the trial court indicated that it hoped "that while the defendant's in prison and — he gets lots of counseling — lots and lots of counseling — for various — various issues, because at some point I hope Mr. Vaughn is able to become a productive member of our society."

¶ 33. Vaughn's appeal focuses on the trial court's reference to the reports finding him competent to go to trial, and the trial court's reference to learning disabilities. The trial court also noted, though, that Vaughn "has disruptive behavior"—not only what it saw in the courtroom but also in the nature of the crime. Nowhere, however, did the trial court view Vaughn as without mental illness, even though he was found competent.

Indeed, all of the things that Vaughn has done—from the crime for which he was convicted, to his earlier criminal activities, and culminating in his in-court behavior, are not the things persons would do if those persons had no mental-health problems. Further, Vaughn does not dispute that he has learning disabilities, and has thus not shown that the trial court's reference to that was inaccurate.

¶ 34. Vaughn has not shown that the trial court "actually relied" on inaccurate information "regarding Allen Vaughn's mental health in sentencing him," as he argues. (Uppercasing omitted.) That it did not have the evidence presented at the postconviction hearing does not change this.

D. *Vaughn's developing mental illness as a "new factor" justifying a modification of his sentence.*

¶ 35. Vaughn claims that the postconviction testimony by the psychiatrist that Vaughn has a developing mental illness warrants a modification of his sentence. No one disputes that "a circuit court [has] discretion to modify sentences in an appropriate case." *State v. Harbor*, 2011 WI 28, ¶ 51, 333 Wis. 2d 53, 78, 797 N.W.2d 828, 840. Under established law, a "new factor" may justify a circuit court's exercise of its sentence-modification discretion. A "new factor" is "a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties." *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69, 73 (1975); *see also Harbor*, 2011 WI 28, ¶ 52, 333 Wis. 2d at 78, 797

N.W.2d at 840 (reaffirming *Rosado*'s definition). The analysis is two-fold: First, "[w]hether a fact or set of facts presented by the defendant constitutes a 'new factor' is a question of law" that we review *de novo*. *See Harbor*, 2011 WI 28, ¶ 33, 333 Wis. 2d at 71, 797 N.W.2d at 837. Second, "whether that new factor justifies sentence modification is committed to the discretion of the circuit court, and we review such decisions for erroneous exercise of discretion." *Ibid.* "The defendant has the burden to demonstrate by clear and convincing evidence the existence of a new factor." *Id.*, 2011 WI 28, ¶ 36, 333 Wis. 2d at 72, 797 N.W.2d at 838.

██

¶ 36. The postconviction court determined that Vaughn's mental health was a "new factor" in the sense that the trial court was unaware of the analyses offered by the psychiatrist in his post-sentencing report and at the postconviction hearing. On our *de novo* review, we agree. The postconviction court also determined, though, that it had to decide "whether this factor unknown at the time of sentencing frustrated the Judge's intent at sentencing and therefore requires a new sentencing of the defendant." The postconviction court held that it did not: "It appears to this court that the diagnosis of the defendant has not frustrated the sentence no [*sic*–nor?] caused Mr. Vaughn any difficulties in receiving appropriate treatment." Vaughn's appeal complains that the postconviction court applied the wrong standard because *Harbor* held that there is no *requirement* that the new factor "frustrate" the sentence in order to justify modification of that sentence. *See id.*, 2011 WI 28, ¶ 52, 333 Wis. 2d at 78, 797 N.W.2d at 840 (withdrawing language from earlier cases "that suggests an additional requirement that an alleged new factor must also frustrate the purpose of the original sentence"). The post-sentencing

court may still, however, consider whether the new factor frustrates the original sentencing scheme. *See id.,* 2011 WI 28, ¶ 50, 333 Wis. 2d at 78, 797 N.W.2d at 840 ("A circuit court might conclude that its entire approach to sentencing would have been different had it been aware of a fact that is 'highly relevant to the imposition of sentence.' Even so, the court may not be able to conclude that the new fact, which would have changed its entire approach to sentencing, necessarily frustrates the purpose of the original sentence it imposed.") (quoted source omitted). *See also State v. Ninham,* 2011 WI 33, ¶ 89, 333 Wis. 2d 335, 384, 797 N.W.2d 451, 476 ("In determining whether to exercise its discretion to modify a sentence on the basis of a new factor, the circuit court may, but is not required to, consider whether the new factor frustrates the purpose of the original sentence.").

¶ 37. Vaughn contends that the postconviction court viewed the frustrate-the-sentence element as a prerequisite (when, as we have seen, it is one consideration that the post-sentencing court may apply), and seeks a remand for an exercise of discretion that is consistent with the *Harbor* rule. The postconviction court's use of the word "nor" (a disjunctive word) (apparently mistyped as "no," as we have seen), shows that the postconviction court did not use the "frustration" factor as the deal-breaker in connection with Vaughn's request for sentence modification, but, rather, also considered whether Vaughn's then current mental health warranted a modification of his sentence. It concluded that it did not because Vaughn's sentence has not "caused Mr. Vaughn any difficulties in receiving treatment." Indeed, as we have seen, the statutes specifically permit the civil commitment of persons confined to prison if that becomes necessary for the prisoner's care and treatment in a mental-health envi-

ronment that might be more appropriate than a prison. *See* Wis. Stat. § 51.20(1)(ar) (civil commitment of a "mentally ill" prisoner in need of treatment where "appropriate less restrictive forms of treatment have been attempted with the individual and have been unsuccessful"). Accordingly, we cannot say that the postconviction court erroneously exercised its discretion in concluding that Vaughn did not show that his sentence should be modified.

*By the Court.*—Judgment and order affirmed.