STATE of Wisconsin, Plaintiff-Respondent,

v.

Demian Hyden McDERMOTT,
Defendant-Appellant.†

Court of Appeals

*No. 2010AP2232–CR. Submitted on briefs December 6, 2011.
—Decided January 10, 2012.*

2012 WI App 14

(Also reported in 810 N.W.2d 237.)

† Petition for Review.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert R. Henak* of *Henak Law Office, S.C.*, Milwaukee, and *Amelia L. Bizzaro* of *Bizzaro Law LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. Demian McDermott appeals the circuit court's order denying his motion to modify his sentence for first-degree intentional homicide without first holding an evidentiary hearing. McDermott argues that he has shown new factors that justify a reduction in his parole-eligibility date. We disagree and affirm.

## I.

¶ 2. In 1991, a jury found McDermott guilty of first-degree intentional homicide while possessing a dangerous weapon, as a party to a crime. *See* Wis. Stat. §§ 940.01(1), 939.63(1)(a)2, & 939.05 (1989–90). McDermott was born on October 8, 1972, and was thus barely over eighteen when he and his sixteen-year old accomplice killed the victim on October 13, 1990. The accomplice was the shooter. Section 940.01(1) made first-degree intentional homicide a "Class A felony," Wis. Stat. § 939.50(1)(a) (1989–90), the punishment for which was a mandatory life sentence with the trial court having the discretion to set a parole-eligibility date, Wis. Stat. §§ 939.50(3)(a) & 973.014(2) (1989–90). The trial court sentenced McDermott to life imprisonment and made him eligible for parole in 2025.[1]

---

[1] We commend the State for including the full transcript of McDermott's sentencing in its supplemental appendix, even though this was McDermott's responsibility. See Wis. Stat. Rule 809.19(2)(a) ("The appellant's brief shall include a short appen-

¶ 3. In sentencing McDermott, the trial court characterized the crime as "a pre-planned premeditated execution":

> You were convicted of being a party to a crime of intentional homicide, which was discussed at least a few days prior to the act. Graves were made, firing of a weapon had taken place to see whether or not anybody above the hill would be able to recall or at least hear any of the shots that were fired.

¶ 4. The trial court called McDermott "the deliverer of that death. You were the deliverer. You brought a person there to meet that person's death."

¶ 5. Earlier, in his sentencing allocution, McDermott insisted that he was innocent: "[E]ven though I have been found guilty, I still maintain my innocence, and that will never be taken away from me. My freedom has, but my innocence will never be taken away from me." Admitting that he had "made a lot of bad decisions in my life," McDermott said that during the thirteen months of pre-trial incarceration he "learned many valuable lessons" and "learned that the life I was living was wrong." He sought leniency, contending that he was only guilty of "not telling the police" about the murder and of "dealing drugs," and did not deserve "life in prison":

> [A] couple of years, maybe even five years to rehabilitate me. I am almost looking forward to doing it. At this point I am not totally rehabilitated, but I am striving. I have

dix containing, at a minimum, the findings or opinion of the circuit court, limited portions of the record essential to an understanding of the issues raised, including oral or written rulings or decisions showing the circuit court's reasoning regarding those issues."); see also Wis. Stat. Rule 809.19(3)(b) ("The respondent may file with his or her brief a supplemental appendix.").

got the attitude. I am going to better myself. I don't want to be the same Demian McDermott. I want to earn back my respect. I don't want people looking at me, saying he's a cold blooded murderer or he's a drug dealer, stay away. I don't want people to be uncomfortable around me.

¶ 6. The trial court recognized the major sentencing factors and said that it would take into account: "the gravity of the offense, which by case law the Court must consider, along with the character of the defendant and the need to protect the community." *See State v. Gallion*, 2004 WI 42, ¶ 40, 270 Wis. 2d 535, 556–557, 678 N.W.2d 197, 207 (Objectives of sentencing "include but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others."). Although the State recommended a forty-five-year parole-eligibility date of 2035, which was the sixteen-year-old shooter's sentence, the trial court demurred and said that because McDermott "didn't have any previous contacts with the system" it "fe[lt] there should be some light at the end of the tunnel." Yet, the trial court opined that even though he was not the triggerman, McDermott "had the equal responsibility of this horrendous act," and that McDermott's age "was the only mitigating factor" it saw in the case, "if someone was to conclude there was a mitigating factor."

¶ 7. Commenting on McDermott's assertion that he did not "want people to be uncomfortable around me," the trial court said that it would "never feel comfortable around you knowing what I've read in this case. Knowing that you are a risk to the community based on this offense, the nature of this act, calls for something more than just a life sentence." It further opined that it was "necessary that a message be sent to the rest of your friends who are probably somewhat

321

culpable, but not to the extent that you were" but who apparently were not charged.

¶ 8. McDermott does not argue that the trial court erroneously exercised its sentencing discretion in determining that he should not be eligible for parole until 2025. Rather, as noted, McDermott contends that there are new factors that warrant a reduction in his parole-eligibility date, arguing that: (1) he helped law enforcement by participating in programs designed to dissuade youth from crime; (2) he has changed since 1991 and is no longer a threat; and (3) recent research shows that persons around the age of eighteen are not as mature as adults and, therefore, should not be held to the same degree of culpability as adults. We address these matters in turn.

## II.

¶ 9. Although finality is as important in sentencing matters as it is elsewhere in the law, a sentence may be modified if defendant shows a new factor that warrants a modification. *State v. Harbor*, 2011 WI 28, ¶¶ 35, 51, 333 Wis. 2d 53, 72, 77, 797 N.W.2d 828, 837, 840.

> [T]he phrase 'new factor' refers to a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.

*Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69, 73 (1975). This definition was reaffirmed by *Harbor*, 2011 WI 28, ¶¶ 40, 52, 333 Wis. 2d at 74, 78, 797 N.W.2d at 838, 840. A new-factor analysis is a two-step pro-

cess: (1) is there a "new factor," and, if so, (2) does the "new factor" justify modification of the defendant's sentence? *Id.*, 2011 WI 28, ¶¶ 36–38, 333 Wis. 2d at 72–73, 797 N.W.2d at 838. "The defendant has the burden to demonstrate by clear and convincing evidence the existence of a new factor." *Id.*, 2011 WI 28, ¶ 36, 333 Wis. 2d at 72, 797 N.W.2d at 838. Whether he or she has satisfied this burden is a question of law that we decide *de novo.* *See ibid.* If the defendant shows that there are one or more new factors, the issue of whether the new factors warrant a modification of the defendant's sentence is within the circuit court's discretion. *Id.*, 2011 WI 28, ¶ 37, 333 Wis. 2d at 73, 797 N.W.2d at 838. As seen below on our *de novo* analysis of the legal issue, we conclude that McDermott has not satisfied the first aspect of the new-factor test—none of the matters he raises are "new factors."[2]

---

[2] McDermott complains that the circuit court "erroneously exercised its discretion by its wholesale adoption of the State's brief as its decision." (Most capitalization omitted.) The sum total of the circuit court's analysis in denying McDermott's sentence-modification motion without first holding an evidentiary hearing is: "For all of the reasons set forth in the State's excellent brief, which the court adopts as its decision in this matter, the court denies the defendant's motion as well as the evidentiary hearing he requests." We agree with McDermott that this is inappropriate—judges must not only make their independent analyses of issues presented to them for decision, but should also explain *their* rationale to the parties and to the public. *See Trieschmann v. Trieschmann*, 178 Wis. 2d 538, 541–542, 504 N.W.2d 433, 434 (Ct. App. 1993) (Improper to "simply accept[] a [party]'s position on all of the issues of fact and law without stating any reasons for doing so[.]"); *cf.* Wis. Stat. § 751.10 ("The supreme court shall decide all cases in writing."); Wis. Stat. § 752.41(1) ("In each case, the court of appeals shall provide a written opinion containing a written

## 1. *Alleged help to law enforcement.*

¶ 10. McDermott's first alleged "new factor" is that, as phrased in his brief, "[s]ince entering the prison system, McDermott has participated in two programs whose goal was to influence juveniles seemingly destined for the court system to make better decisions." The two

summary of the reasons for the decision made by the court."). Although we do not in Wisconsin have a specific rule that requires trial judges to state their reasons, as does, for example, the United States Court of Appeals for the Seventh Circuit, we believe that the following admonitions by that court are a good reminder why judicial decisions at all levels must be explained by the judge or judges in their own words:

> Circuit Rule 50, which requires a judge to give reasons for dismissing a complaint, serves three functions: to create the mental discipline that an obligation to state reasons produces, to assure the parties that the court has considered the important arguments, and to enable a reviewing court to know the reasons for the judgment. A reference to another judge's opinion at an earlier stage of the case, plus an unreasoned statement of legal conclusions, fulfils none of these.
>
> . . . .
>
> From time to time district judges extract portions of briefs and use them as the basis of opinions. We have disapproved this practice because it disguises the judge's reasons and portrays the court as an advocate's tool, even when the judge adds some words of his own . . . . Judicial adoption of an entire brief is worse. It withholds information about what arguments, in particular, the court found persuasive, and why it rejected contrary views. Unvarnished incorporation of a brief is a practice we hope to see no more.

*DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990). We agree. Since our review of the circuit court's denial of McDermott's motion to modify his sentence is based on our *de novo* analysis of whether he has presented new factors, the circuit court's failure to give *its* reasons (rather than adopt the State's brief *in haec verba*) is of no consequence in this case.

programs in which McDermott voluntarily participated were: (1) the Blood-Related Inner City Kids program at the Green Bay Correctional Institution; and (2) *Project: Tomorrow* at the Prairie Correctional Institution in Minnesota, to which McDermott was transferred in 2000. According to McDermott's affidavit in the Record, the Green Bay program "targeted" juveniles whose average age was fourteen, and who "were selected based on problems they were having with the law, at home or at school, and included children living in group homes." McDermott's affidavit averred that he:

> was one of several inmates participating who would spend every Monday from about 8 AM to 11 AM with the children. We would share our life stories and relate stories of prison life. The purpose of this was to encourage a frank discussion of what was going on in the children's lives and provide them with the tools for making better choices.

¶ 11. *Project: Tomorrow* was similar, and, according to McDermott's affidavit, entailed a rigorous selection process for inmate-participants. McDermott's affidavit indicates that *Project: Tomorrow* also tried to steer young folks away from a life of crime. It included:

- A "mock strip search, in order to impress upon children the seriousness of the program and explain the rules for participating."

- Presentations by the inmates that, among other things, "explained why we were in prison," and the harsh realities of prison life.

- The participating children who did not or could not correctly answer some questions put to them by the inmates "had to do push-ups."

¶ 12. McDermott's affidavit explained that *Project: Tomorrow*'s overriding emphasis was to "tackle hard issues like peer pressure, drug use, abuse, and making good decisions."

¶ 13. Wisconsin recognizes that a defendant's "post-sentencing substantial assistance to law enforcement is a new factor." *State v. Doe*, 2005 WI App 68, ¶¶ 8–9, 280 Wis. 2d 731, 739–740, 697 N.W.2d 101, 105–106 (adopting the rules in the federal system). The key concept is, of course, embodied in the phrase "substantial assistance"—there must be more than generalized cooperation with prison authorities or even efforts to dissuade others from a life of crime:

> We are satisfied that the broader rule of permitting the trial court, in appropriate cases, to modify a sentence after substantial assistance has been given to authorities, promotes sound public policy. Sentence modification should be available to those already sentenced who possess and can provide valuable information to law enforcement to assist in ferreting out and curtailing crime.

*Id.*, 2005 WI App 68, ¶ 10, 280 Wis. 2d at 740, 697 N.W.2d at 106. In *Doe*, the defendant was convicted of maintaining a drug-trafficking place, possessing a firearm although a felon, and bail-jumping. *Id.*, 2005 WI App 68, ¶ 2, 280 Wis. 2d at 735–736, 697 N.W.2d at 103–104. After sentencing, he gave information about a death thought to be accidental, and the killer was "convicted almost entirely on information supplied by the defendant." *Id.*, 2005 WI App 68, ¶ 4, 280 Wis. 2d at 736, 697 N.W.2d at 104. We held that this "substantial assistance" was a "new factor" permitting exercise of the trial court's discretion as to whether modification of

*Doe*'s sentence was justified. *Id.*, 2005 WI App 68, ¶ 10, 280 Wis. 2d at 740–741, 697 N.W.2d at 106.

¶ 14. *Doe* is a far cry from what we have here. The programs in which McDermott participated may or may not have been valuable in deterring at least some youngsters from committing crimes, but under no stretch of the imagination can McDermott's participation be equated with the type of "substantial assistance" envisioned by *Doe*; simply put, McDermott did not give *any* "*information* to law enforcement *to assist in ferreting out and curtailing crime*," no less "valuable information." *See id.*, 2005 WI App 68, ¶ 10, 280 Wis. 2d at 740, 697 N.W.2d at 106 (emphasis added). McDermott's participation in the programs was not a "new factor" and thus, as a matter of law, does not pass the first hurdle of *Harbor*'s two-part analysis.

 2. *Alleged evidence that McDermott is no longer a threat to society.*

██ ██

¶ 15. Recognizing that a new factor does not encompass post-sentencing "rehabilitation," *see State v. Crochiere*, 2004 WI 78, ¶¶ 14–15, 273 Wis. 2d 57, 68–69, 681 N.W.2d 524, 530, *clarified or modified on other grounds by Harbor*, 2011 WI 28, ¶ 47 n.11, 333 Wis. 2d at 76 n.11, 797 N.W.2d at 839 n.11, McDermott contends that his "actions over the past 19 years remove" the basis for the trial court's assertion that it would "never feel comfortable around you." He says that he "has made good" on his promise to rehabilitate himself, and that this is, therefore, a "new factor" that justifies modifying his parole-eligibility date: "Had the [trial] court known that McDermott's transformation in fact was sincere, the scales would have weighed differ-

ently, with his sincerity mitigating against the perceived need for such a lengthy period before parole consideration to protect the community or to address his character." McDermott says "that the attainment of his goals and proving that he in fact could be rehabilitated, something the sentencing court was uncertain he could accomplish, is the new factor. McDermott's conduct puts to rest any doubt the [trial] court had about his ability to change." This, however, is but an "I am now rehabilitated" argument in slightly different clothes, and could apply to almost any defendant who on sentencing day apologizes and promises to put his disordered life together. If accepted as a "new factor," it would wholly gut established law in Wisconsin that "an inmate's progress or rehabilitation while incarcerated" is not a "new factor." *See Crochiere*, 2004 WI 78, ¶ 15, 273 Wis. 2d at 69, 681 N.W.2d at 530.

### 3. *Recent research into adolescent brains.*

¶ 16. McDermott also argues that what he says is the recent realization in the scientific community that adolescents are generally impulsive and often have trouble making wise choices is a new factor that, if known by the trial court in 1991, would or might have resulted in a different parole-eligibility date. This is how he puts it in his main brief on this appeal:

> Adolescence generally refers to the period of time encompassing the beginning of puberty through the assumption of adult roles. While technically, a person becomes an "adult" when he turns 18 years old, that is not always the practical truth. In neuroscience, for example, adolescence is not over until the adult brain

function is attached. Although different from person to person, this generally does not occur until a person's early 20s. This puts McDermott squarely in the category of an adolescent at the time of his crime, despite the fact that he was five days over the age of 18 at the time of his crime.

. . . .

Adolescents are not just likely to make bad judgments; they are physiologically pre-destined to do so. Risk taking – in any area, be it drugs, sex, alcohol or criminal activity – is so pervasive that "it is statistically aberrant to refrain from such behavior during adolescence." L.P. Spear, *The Adolescent Brain and Age-Related Behavioral Manifestations,* 24 NEUROSCIENCE & BIOBEHAV. REV. 417, 421.

The difference between the adult and the adolescent brain is not that an adolescent cannot determine right from wrong, but in how they think.

¶ 17. All this may be true, and we accept it as true for the purposes of this opinion. But that does not make what McDermott contends is new research a "new factor." There are two dispositive reasons.

¶ 18. First, *State v. Ninham,* 2011 WI 33, 333 Wis. 2d 335, 797 N.W.2d 451, rejected the very new-research contentions McDermott makes here. Ninham was convicted for first-degree intentional homicide and physical abuse of a child for crimes he committed when he was fourteen, and was sentenced to imprisonment for life, without the possibility of any parole. *Id.,* 2011 WI 33, ¶ 2, 333 Wis. 2d at 344, 797 N.W.2d at 456. He, as does McDermott, argued that the new research was a "new factor":

Ninham also argues that he is entitled to sentence modification on the grounds that new scientific re-

> search regarding adolescent brain development consti-
> tutes a new factor that frustrates the purpose of his
> sentence. Specifically, Ninham directs us to magnetic
> resonance imaging (MRI) studies, apparently unavail-
> able at the time Ninham was sentenced, which tend to
> show that the brain is not fully developed early in
> childhood and that making impulsive decisions and
> engaging in risky behavior is an inevitable part of
> adolescence. The studies further explain, according to
> Ninham, that as the brain matures, adolescents almost
> universally grow out of their impulsive and risky be-
> havior. In addition, Ninham informs us that a growing
> body of research suggests that alcohol causes more
> damage to developing teenage brains than previously
> thought. According to Ninham, this new scientific
> research on adolescent brain development undermines
> the circuit court's findings regarding Ninham's culpa-
> bility and recidivism.

*Id.*, 2011 WI 33, ¶ 87, 333 Wis. 2d at 382–383, 797 N.W.2d at 475 (footnotes omitted). *Ninham* noted that Ninham did not show "by clear and convincing evidence that a new factor exists" because even though the studies proffered may not have been "in existence at the time Ninham was sentenced," "the conclusions reached by the studies were already in existence and well reported by the time Ninham was sentenced in 2000." *Id.*, 2011 WI 33, ¶ 91, 333 Wis. 2d at 385, 797 N.W.2d at 476.

¶ 19. The conclusions were also known when the trial court sentenced McDermott. Indeed, *Ninham* referenced a 1988 United States Supreme Court capital-punishment decision that also recognized this long-known reality:

> Inexperience, less education, and less intelligence make
> the teenager less able to evaluate the consequences of his
> or her conduct while at the same time he or she is much
> more apt to be motivated by mere emotion or peer

pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.

*Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (footnote omitted); *Ninham* 2011 WI 33, ¶ 92, 333 Wis. 2d at 386, 797 N.W.2d at 476. Thus, "the 'new' scientific research regarding adolescent brain development to which Ninham refers only confirms the conclusions about juvenile offenders that the Supreme Court had 'already endorsed' as of 1988." *Id.*, 2011 WI 33, ¶ 92, 333 Wis. 2d at 386, 797 N.W.2d at 476–477 (citation omitted).

¶ 20. Second, that adolescents are generally more impulsive than adults has been known since humans were able to observe their environment. Thus, for example, Aristotle noted in his *Nicomachean Ethics* that, "[y]oung people are in a condition like permanent intoxication[.]" Wikiquote, http://en.wikiquote.org/wiki/ Aristotle (last visited Dec. 12, 2011). And even before that, Book 23 of Homer's *The Illiad* recited in one of the many translations:

> You know how a young man
> can do foolish things. His mind works quickly,
> but his judgment's suspect.[3]

¶ 21. To say, as McDermott argues, that the trial court did not realize what recent scientific research has confirmed ignores reality, and, in essence, puts the old wine of human experience in the new bottles of recent research and labels the entire package as "new." As we

---

[3] Homer, *The Illiad*, http://www.mlahanas.de/Greeks/Texts/ Iliad/iliad23.htm (Translation by Ian Johnston. Johnston's lines reference: 723–725, asserted to be lines 589–591 in the Greek) (last visited Dec. 12, 2011).

have seen, *Ninham* rejected this false labeling. *Ninham*, 2011 WI 33, ¶ 92, 333 Wis. 2d at 386, 797 N.W.2d at 476–477 ("[T]he 'new' scientific research regarding adolescent brain development to which Ninham refers only confirms the conclusions about juvenile offenders that the Supreme Court had 'already endorsed' as of 1988.") (citation omitted).

¶ 22. In essence, McDermott's lament echoes what has been attributed to Ben Franklin: "Reckless youth makes rueful age."[4] The legislature has created a scheme of accountability for convicted criminals, and has given the circuit courts discretion either to deny the possibility of parole to those convicted of first-degree intentional homicide, or to set a parole-eligibility date. Indeed, as we have seen, McDermott and his accomplice killed their victim when McDermott was eighteen. Under the capital-punishment decision on which McDermott relies for his contention that new research on brain function justifies a modification of his parole-eligibility date, *Roper v. Simmons*, 543 U.S. 551, 569 (2005), states may sentence eighteen-year olds to death, *see id.*, 543 U.S at 575. As with *Ninham*, McDermottt has not shown that the new research is a "new factor" under the first aspect of *Harbor*'s two-part analysis. That McDermott may now rue what he did does not change things.

*By the Court.*—Order affirmed.

¶ 23. KESSLER, J. (*dissenting*). I conclude that the trial court applied a standard of law that our supreme court has withdrawn. I also conclude that McDermott has alleged facts which constitute a new

---

[4] MARKETING SCORE, QUOTES: BENJAMIN FRANKLIN, http://mscore.net/Quotes/tabid/79/ctl/quoteview/mid/439/ID/2479/AuthorID/1618/Default.aspx (last visited Dec. 12, 2011).

factor under the correct standard. Thus, I would reverse and remand for a hearing.

¶ 24. To obtain modification of sentence, a defendant must establish the existence of a "new factor" which was unknown to, or overlooked by, the trial court at the time of sentencing. *See State v. Stafford*, 2003 WI App 138, ¶¶ 12–13, 265 Wis. 2d 886, 667 N.W.2d 370. Initially our supreme court defined a "new factor" in *Rosado v. State*, 70 Wis. 2d 280, 234 N.W.2d 69 (1975), as "a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing[.]" *Id.* at 288. Later, in *State v. Michels*, 150 Wis. 2d 94, 441 N.W.2d 278 (Ct. App. 1989), we described the *Rosado* definition as limited to "situations where the new factor frustrates the purpose of the original sentencing." *Michels*, 150 Wis. 2d at 97. In *State v. Harbor*, 2011 WI 28, 333 Wis. 2d 53, 797 N.W.2d 828, however, our supreme court withdrew the *Michels* language, and explained "that frustration of the purpose of the original sentence is not an independent requirement when determining whether a fact or set of facts alleged by a defendant constitutes a new factor." *Harbor*, 333 Wis. 2d 53, ¶¶ 48, 52.

¶ 25. The State argued to the trial court in its Brief Opposing Defendant's Motion for Sentence Modification, that "[t]he defendant's program participation does not *frustrate the purpose of the original sentencing*" and that "[l]ikewise, adolescent brain research . . . *does not frustrate the purpose of the original sentence.*" (Emphasis added.) The trial court adopted the State's brief as its decision on the defendant's motion, thereby finding that the new factors alleged did not frustrate the purpose of the original sentencing. Because the definition of "new factor" that was relied upon by the State and the trial

court has been withdrawn by our supreme court, the trial court relied on an incorrect legal definition.

¶ 26. As the *Harbor* court explained: "[w]hether a fact or set of facts presented by the defendant constitutes a 'new factor' is a question of law." *Id.*, 333 Wis. 2d 53, ¶ 33 (citation omitted). "We review questions of law independently of the determinations rendered by the [trial] court." *Id.* "The existence of a new factor does not automatically entitle the defendant to sentence modification . . . . Rather, if a new factor is present, the [trial] court determines whether that new factor justifies modification of the sentence . . . . In making that determination, the [trial] court exercises its discretion." *Id.*, ¶ 37.

¶ 27. McDermott's efforts while in prison to deter at-risk youth from lives of crime is positive, even exemplary, behavior. However, I agree with the Majority that under existing law we cannot say as a matter of law that such exemplary behavior in prison constitutes a new factor in the context of a motion for sentence modification.

¶ 28. I part from the Majority, however, on the question of whether scientific research confirming that portions of the adolescent brain are not fully developed is a new factor highly relevant to the sentence imposed here. The Majority, like the State, observes that we all know from experience that adolescents often demonstrate amazingly poor judgment, and therefore concludes that no new facts are being offered here. *See* Majority, ¶¶ 17–22. I disagree. What is offered here is the assertion—supported at this time only by documents discussing such facts—that scientists can now physically measure the degree to which various portions of the brain have developed at various ages and can relate that development to specific brain functions.

334

¶ 29. Because McDermott's judgment at the time of his crime, when he had recently passed his eighteenth birthday, was not merely poor but could be described as abysmal, the trial court was rightly concerned with whether it would ever be safe to even consider releasing him into society. However, the technology now available, which allows measurement of brain segment development, and scientific explanations of behavioral changes based on brain development, are relevant to both the protection of the community and the defendant's character and rehabilitation needs. Had this information been available to the trial court, it is reasonably probable that the trial court would have considered such information in setting a date for parole eligibility.

¶ 30. For the reasons explained above, I conclude that McDermott has made a sufficient showing of a new factor relevant to the imposition of sentence to entitle him to the opportunity to prove by clear and convincing evidence that the new factor should result in modification of his parole date. I would remand to the trial court for a hearing on the issue.