**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 30, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP9-CR**

Cir. Ct. No. 1996CF576

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

JONATHAN L. LIEBZEIT,

   DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Outagamie County: JOHN A. DES JARDINS, Judge. *Reversed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1    GILL, J.  In 2019, after attending a judicial education seminar at which scientific research on brain development in young adults was discussed, the Honorable John A. Des Jardins took it upon himself to write to the State and Jonathan Liebzeit's appellate counsel to have them consider the potential

modification of Liebzeit's 1997 sentence of life without parole.[1]  Liebzeit subsequently filed a postconviction motion to modify his 1997 sentence based on two new factors: (1) new scientific understanding of brain maturity in adolescents; and (2) Liebzeit's brain damage from his inhalant use.  The circuit court ultimately granted Liebzeit's motion and modified Liebzeit's sentence.

¶2      The State appeals the circuit court order modifying Liebzeit's 1997 sentence.  The State contends that new scientific research does not constitute a new factor under Wisconsin law.  The State further argues that neither Liebzeit's brain damage due to his inhalant use nor the results of any new research were highly relevant to Liebzeit's original sentence.

¶3      We conclude the circuit court erred by modifying Liebzeit's original sentence because Liebzeit failed to meet his burden of showing the existence of either of his claimed new factors by clear and convincing evidence.  Existing case law prohibits the circuit court from relying upon scientific research on brain development in emerging adults as a new factor providing a basis for sentence modification because the research and its conclusions were well known at the time of Liebzeit's sentencing in 1997.  *See State v. McDermott*, 2012 WI App 14, 339 Wis. 2d 316, 810 N.W.2d 237.  Moreover, any new information regarding Liebzeit's brain damage from inhalant use and its effect on his impulsivity, and the court's understanding that Liebzeit may have an increased potential for rehabilitation, were not highly relevant to his 1997 sentence.  *See Rosado v. State*,

---

[1] The Honorable John A. Des Jardins presided over Liebzeit's trial and the 1997 sentencing.  Judge Des Jardins also entered the order modifying Liebzeit's sentence that is the subject of this appeal.  Throughout this opinion, we refer to Judge Des Jardins as "the circuit court" unless otherwise noted.

70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975). Accordingly, we reverse the order modifying Liebzeit's sentence.

## BACKGROUND

¶4 In October 1996, Liebzeit and two other individuals, Daniel Mischler and James Thompson, killed Alex Schaffer. Days after the murder, the State charged Liebzeit with one count of first-degree intentional homicide by use of a dangerous weapon as a party to a crime, and one count of concealing a corpse as a party to a crime. The case proceeded to a jury trial.

¶5 At trial, conflicting testimony was presented surrounding the details of the killing. Mischler testified that Liebzeit, who had just turned nineteen years old at the time of the killing, harbored resentment toward Schaffer over trivial matters, including the fact that Schaffer had stolen a hair tie from Liebzeit's girlfriend years prior.

¶6 According to Mischler, Liebzeit created a plan in February 1996 to get back at Schaffer. Liebzeit's plan involved inviting Schaffer over to Liebzeit's father's house and then taking him into sewer tunnels located in a nearby park to "hurt" or "scare" him.[2] There was also testimony from Jayme Lynn Bowman, who was living at Liebzeit's father's house at the time, that Liebzeit and Thompson wanted to invite Schaffer over to "kill" him and that they were "excited" about doing it. Bowman testified that she asked Liebzeit if the trivial matters were "really a reason to kill [Schaffer]." Bowman said that Liebzeit smiled and said "yeah." Liebzeit testified, however, that it was Mischler who

---

[2] The sewer tunnels were roughly five or six feet wide.

hated Schaffer because Schaffer owed Mischler money. Liebzeit also testified that Mischler and Thompson brought up the idea of going to the park to beat up Schaffer.

¶7 Schaffer's mother testified that around midnight on October 27, 1996, Schaffer received a call from Liebzeit inviting Schaffer over to Liebzeit's house. When Schaffer arrived, Mischler and Thompson were also there. Mischler testified that, prior to Schaffer's arrival, Thompson showed him "maps of the sewer tunnels under the park," and that either Liebzeit or Thompson "had a bat" wrapped in electrical tape. According to Mischler, Liebzeit wanted to "beat [Schaffer] up with the bat." Mischler also testified that he expressed hesitation to Thompson and Liebzeit about hurting Schaffer. Liebzeit responded by stating that Mischler did not have to hurt Schaffer and that Mischler "could turn away and just crouch down and cover [his] ears."

¶8 Once Schaffer arrived at the house, he "had a couple of beers." After approximately fifteen minutes, Liebzeit told Schaffer they were going to the park to smoke marijuana. The four then walked through the park and into the sewer tunnels. Mischler testified that either Thompson or Liebzeit had the bat as they walked to the park, but that he could not actually see the bat.

¶9 After the four explored the sewer tunnels for several minutes, they began walking back toward one of the sewer tunnel openings to leave. Liebzeit then repeatedly struck Schaffer with the baseball bat, including at least once in the head. Schaffer attempted to run away, but Mischler grabbed Schaffer's shirt and prevented him from leaving the sewer tunnel. Mischler testified that Liebzeit then continued beating Schaffer with the baseball bat. While being beaten, Schaffer continuously said that he was sorry and offered them money to stop.

¶10     Schaffer briefly escaped Mischler's grasp, but Thompson quickly caught Schaffer and repeatedly hit him with a flashlight. According to Mischler, Schaffer then escaped from Thompson and ran out of the sewer tunnel while being chased by Liebzeit and Thompson. Mischler testified that when he exited the tunnel, he observed the three sitting against the exterior of the tunnel.

¶11     Mischler further testified that Schaffer said, "Listen, I learned my lesson. I'm sorry. I'll give you money if you let me go." According to Mischler, Liebzeit responded by "yelling" and "swearing" at Schaffer and then beat Schaffer with the baseball bat, hitting Schaffer at least once "over the back of the head" making "a cracking noise." Liebzeit testified that Thompson also hit Schaffer multiple times with the bat. The beating continued until Schaffer ended up in a pool of water near the sewer tunnel. In all, Schaffer was hit "multiple" times, including at least six times in the head, and had injuries to his head, left hand, wrists, forearms, elbows, and legs.

¶12     Mischler eventually went into the water, at the urging of either Liebzeit or Thompson, and with the assistance of Thompson, held Schaffer under the water until he stopped moving. According to Mischler, Liebzeit yelled for Thompson to check for Schaffer's pulse. After Thompson felt no pulse, he and Mischler moved Schaffer's body into the sewer tunnel. Thompson stole Schaffer's wallet, which contained three dollars, and left the park with Liebzeit and Mischler.

¶13     Mischler and Bowman testified that Liebzeit and Thompson laughed about the murder when they returned to the house, including about the fact that Schaffer told them he had money even though he only had three dollars. Upon arriving back at the house, Liebzeit, Thompson, and Mischler removed the tape

from the bat. Later that day, Liebzeit and Thompson moved Schaffer's body further into the sewer tunnel. The medical examiner testified that Schaffer's cause of death was determined to be a combination of multiple blunt force injuries and drowning. The jury found Liebzeit guilty of both counts.

¶14 Prior to sentencing, a Department of Corrections agent prepared a presentence investigation report (PSI) after meeting with Liebzeit. The PSI outlined Liebzeit's long history of drug use, particularly his use of inhalants beginning in sixth grade. The PSI also referenced Liebzeit's institutional history, including a failed attempt at admittance into Winnebago Mental Health Institute, a hospitalization due to suicidal tendencies, and participation in the Libertas Treatment Program—a drug and alcohol treatment program in Green Bay.

¶15 At Liebzeit's sentencing in 1997 (the 1997 sentencing), the State referenced Liebzeit's history of drug use. Similarly, Liebzeit's defense counsel[3] referenced Liebzeit's inhalant addiction numerous times. For example, his defense counsel explained that Liebzeit's mother wanted him committed to Winnebago Mental Health Institute for his inhalant addiction, but that the institution would not admit him. Likewise, the circuit court noted Liebzeit's substance abuse issues during its sentencing remarks, stating that Liebzeit had used nearly every drug available, had a particularly serious problem with inhalants, and "rejected efforts at Libertas," among other institutions.

¶16 The circuit court determined that "there was a significant amount of planning and premeditation that went into [Schaffer's] homicide." For example,

---

[3] We refer to Liebzeit's trial counsel as defense counsel, and his current counsel as appellate counsel.

6

the court referenced statements that Liebzeit had purportedly made nine months prior to the murder about wanting to kill Schaffer. Regarding the possibility of rehabilitation, the court found that Liebzeit could not be rehabilitated. The court stated that "[t]here's a monster in there, and we don't know when it's going to come out again." Ultimately, the court sentenced Liebzeit on Count 1—first-degree intentional homicide by use of a dangerous weapon as a party to a crime—to life in prison without the possibility of parole, and on Count 2—hiding a corpse as a party to a crime—to a concurrent five-year term of confinement.

¶17     In 2019, Judge Des Jardins attended a judicial education seminar at which a speaker, Dr. Leah Somerville, discussed new research on brain development in emerging adults. Thereafter, Judge Des Jardins sentenced an eighteen-year-old individual, causing him to recall Liebzeit's case and Dr. Somerville's paper. As a result, in 2020, Judge Des Jardins sent a letter to the State and Liebzeit's appellate counsel suggesting that a sentence modification may be appropriate based on new scientific research into "brain development of persons" between eighteen- and twenty-one-years old that was not available at the time of the 1997 sentencing.[4] Judge Des Jardins referenced Dr. Somerville's

---

[4] The circuit court's letter also stated that it would "contact counsel to set a scheduling conference date" regarding the potential sentence modification. At the circuit court level, the State subsequently raised a judicial bias claim based on the court raising the sentence modification issue sua sponte. The State also brought forth an argument that the court was actually attempting to resentence Liebzeit—which would be barred under WIS. STAT. § 808.075 (2019-20) due to a pending appeal—as opposed to a sentence modification motion under WIS. STAT. § 973.19 (2019-20)—which is permitted even during a pending appeal under § 808.075(4)(g)6. (2019-20). The State appears to abandon both arguments on appeal. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 493, 588 N.W.2d 475 (Ct. App. 1998) ("[W]hen a party fails to argue an issue in its [briefs on appeal], the appellate court may treat the issue as having been abandoned, even though the issue was presented to the trial court."). In addition, because we ultimately decide this appeal in favor of the State on narrower grounds, we need not address judicial bias or § 808.075. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

paper "that detailed how the brain develops for many years beyond age eighteen." *See* Leah H. Somerville, *Searching for Signatures of Brain Maturity: What Are We Searching For?*, 92 NEURON J. 1164, 1164-67 (2016) (hereinafter, the Somerville Paper).[5]

¶18    Appellate counsel subsequently filed a motion to modify Liebzeit's sentence based on two new factors: (1) new scientific research on brain development in emerging adults; and (2) Liebzeit's brain damage stemming from his inhalant use.  Regarding Liebzeit's brain damage, appellate counsel relied on a "Libertas report [(hereinafter, the Libertas Report)] never presented to the [circuit c]ourt at the time of sentencing [which] revealed that when Liebzeit was 13 years old, he was diagnosed with brain damage as a consequence of an addiction to inhalants."  The Libertas Report further stated that Liebzeit's brain damage "was playing a part in his ability to fully participate in [treatment program] assignments."

---

[5]    Liebzeit cited to other scientific studies throughout the sentence modification process. Liebzeit, for example, cited to a National Institute of Mental Health publication that explained "brain maturation" in young adults.  Another study purported to show that eighteen- to twenty-two-year-old "participants took more risks in the presence of same-age peers than when they were either alone or in the presence of a slightly older young adult."  That said, and as the State pointed out at the sentence modification motion hearing, appellate counsel never submitted those studies into the trial record, and they are therefore not in the appellate record.  From what we can glean, the other studies cited by Liebzeit are in the same vein as the Somerville Paper.

Further, and as we will explain, the circuit court ultimately made its decision citing "new studies on brain development," and referenced the other studies cited by Liebzeit that are not in the record.  We will therefore refer to scientific research regarding young adults' brain maturity generally as "new scientific research on brain development in emerging adults" for the remainder of this opinion, and to the Somerville Paper specifically where appropriate.  Again, we fail to see any relevant difference between the general studies regarding new scientific research on brain development in emerging adults and the Somerville Paper.

¶19    The circuit court then held a nonevidentiary hearing on the sentence modification motion at which it heard argument about whether Liebzeit presented a new factor as a matter of law.[6]  The court concluded that Liebzeit had proven by clear and convincing evidence that both the new scientific research on brain development in emerging adults, and Liebzeit's brain damage resulting from his own inhalant use constituted new factors.

¶20    Addressing Liebzeit's brain damage, the circuit court concluded that the impact the brain damage may have had on Liebzeit's impulse control was relevant to whether Liebzeit was likely to be successfully rehabilitated.  The court also noted that the brain damage information was not presented to the court at the time of Liebzeit's 1997 sentencing.

¶21    The circuit court further concluded that since the 1997 sentencing, new scientific research on brain development in emerging adults had found that individuals between eighteen- and twenty-one-years old function closer to adolescents aged thirteen to seventeen, than adults aged twenty-two to twenty-five-years old.  The court stated this new research "was not available at the time Liebzeit was sentenced."  The court further concluded that the new scientific research on brain development in emerging adults was relevant to Liebzeit's original sentence.

_____

[6] At the circuit court level, Liebzeit also argued in his sentence modification motion that his prison records showed that he "demonstrated the capacity to change."  In response, the State argued that Liebzeit's prison records should not be considered when assessing whether there were new factors warranting sentence modification.  The circuit court did not review the prison records and concluded at the sentence modification motion hearing that those records were not relevant for purposes of a new factor analysis.  Liebzeit did not file an appeal to challenge that conclusion, and we therefore do not address it further.

¶22     Subsequently, the circuit court held a sentence modification hearing. Based on the two new factors, the court amended Liebzeit's 1997 sentence, making him eligible for parole in 2023. The court explained its rationale for modifying Liebzeit's sentence, saying:

> At [the 1997 sentencing,] the [c]ourt focused its attention on the depravity of the crime and its shocking and cruel nature.
>
>     ….
>
> Through brain imaging and other developments in neuroscience[, scientists] have been able to show that emerging adults under the age of 21 or even 25 lack adult level[s] of impulse control, planning, and self-regulation.
>
>     ….
>
> It is likely that [Liebzeit's] brain was damaged and not fully developed. Youthful brains at the age of 19 are different from full-fledged adult brains. If a sentence fails to take into account the differences in an emerging adult brain at age 19 that then results in confinement beyond the duration of their life expectancy, it lacks an understanding of societal decency, even though the crime committed as demonstrated in this case was a callous, deviant act toward humanity.
>
>     ….
>
> At the [1997] sentencing the [c]ourt placed almost all of the weight on the monstrous nature of the homicide. This [c]ourt dismissed the potential for rehabilitation and indicated at that time that how does one rehabilitate a person that has inside himself such rage and anger over such trivial matters that they would have killed a friend. Rehabilitation would be problematic to deal with such an antisocial personality as this.
>
>     ….
>
> Because the [c]ourt was unaware of the issues of brain development and brain damage, it failed to properly consider [Liebzeit's] difficulty to appreciate the risks and consequences of his behavior combined with peer pressures and his home environment. The [c]ourt's belief of [Liebzeit's] long-term dangerousness to society was likely

10

misguided. Again, the [c]ourt based that determination primarily on the nature of the homicide.

....

[T]his [c]ourt did not understand the emerging adult brain development and rejected the possibility of rehabilitation. That was wrong.

The State now appeals.

## DISCUSSION

¶23 Subject to certain constraints, circuit courts have inherent authority to modify criminal sentences. *State v. Harbor*, 2011 WI 28, ¶35, 333 Wis. 2d 53, 797 N.W.2d 828. For example, a court may modify a sentence when it determines that the sentence is illegal or void, or when the sentence is unduly harsh or unconscionable. *Id.*, ¶35 n.8. Courts may also modify a sentence based on a "new factor." *Id.*, ¶35 (citation omitted). Sentence modification, cannot, however, be based on reflection and second thoughts alone. *Id.*

¶24 In this case, the circuit court justified its sentence modification based on the existence of two "new factors." A new factor is:

> [A] fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.

*Id.*, ¶40 (citing *Rosado*, 70 Wis. 2d at 288). We review sentence modification based on a new factor using a two-step inquiry. *Id.*, ¶36. First, Liebzeit bears the burden of demonstrating by clear and convincing evidence that a new factor exists.

11

*See id.* Whether he has met that burden is a question of law that we review de novo.[7] *See id.* If Liebzeit meets that burden, we review the circuit court's decision to modify his sentence for an erroneous exercise of discretion. *See id.*, ¶33. "Accordingly, if a court determines that the facts do not constitute a new factor as a matter of law, 'it need go no further in its analysis.'" *Id.*, ¶38 (citation omitted).

## I. Brain damage from Liebzeit's inhalant use does not constitute a new factor

¶25 The circuit court modified Liebzeit's sentence in part based on new information regarding Liebzeit's brain damage from his inhalant use. The Libertas Report states that Liebzeit suffered permanent "brain damage as a result of his long[-]term inhalant abuse" and that the brain damage played a part "in his ability to fully participate in [treatment program] assignments." The Libertas Report does not state anything else of significance related to his inhalant use or brain damage.

¶26 The circuit court explained that "the impact that [brain] damage may have had on *impulse control* is relevant to whether [Liebzeit] is someone likely to be successfully rehabilitated." (Emphasis added.) Liebzeit echoes the court's analysis by arguing that facts surrounding a defendant's brain damage are highly relevant at sentencing because courts are required to consider "the defendant's character and prospects for rehabilitation," which "in turn, alters the judicial calculus pertaining to protecting the public."

---

[7] Liebzeit argues that we should not review the first part of the new factor analysis using a de novo standard of review. As he correctly concedes, however, a de novo standard of review is well settled in our supreme court's case law. *See, e.g.*, *State v. Harbor*, 2011 WI 28, ¶¶36-37, 333 Wis. 2d 53, 797 N.W.2d 828. We must follow our supreme court's precedent. *See State v. Lira*, 2021 WI 81, ¶46, 399 Wis. 2d 419, 966 N.W.2d 605 ("The supreme court, 'unlike the court of appeals, has been designated by the constitution and the legislature as a law-declaring court.'" (citation omitted)).

¶27    Conversely, the State argues that Liebzeit's purported brain damage and alleged resulting impulsivity were not highly relevant to the imposition of his original sentence because "one of the reasons the [circuit] court imposed life without parole here was precisely because this horrific, unprovoked murder was *not* the result of rashness or impulsivity." We agree with the State and conclude that the court erred when it determined that evidence of Liebzeit's brain damage from inhalants and his alleged impulsivity were highly relevant to the imposition of his original sentence.

¶28    As an initial matter, nothing in the record suggests that Liebzeit's brain damage had any impact on his impulsivity. The Libertas Report simply states that Liebzeit's brain damage played a part "in his ability to fully participate in [treatment program] assignments." It does not elaborate on why Liebzeit's brain damage impacted his ability to participate. At best, the Libertas Report shows that his brain damage might have affected his concentration. But the crimes for which he was convicted were not impulsive crimes caused by an inability to concentrate.

¶29    Even if the Libertas Report provided evidence as to whether Liebzeit's brain damage impacted his impulsivity, impulsivity had no bearing on the circuit court's decision at the 1997 sentencing. To the contrary, as the court explained at that sentencing, the killing was not impulsive—"[t]here was thought; there was contemplation; there was planning." *See McCleary v. State*, 49 Wis. 2d 263, 276, 182 N.W.2d 512 (1971) ("The sentence imposed in each case should call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant." (citation omitted)); *see also State v. Gallion*, 2004 WI 42, ¶¶23, 44 270 Wis. 2d 535, 678 N.W.2d 197. The court also reasoned that Liebzeit "had

opportunities to withdraw, to warn his friend.… but he did not." According to the court, the killing was "cruel, cold, calculated, and vengeful … [in] which [Liebzeit] played a most significant role." The court further described the homicide as the "most serious type of murder," as opposed to those "in the heat of passion" or where "intent is formed instantaneously," such as during the course of a robbery or high-speed chase. Because the court in 1997 did not find that the killing was in any way the result of Liebzeit's impulsivity, the fact that his brain damage due to inhalant use may have caused him to otherwise act impulsively was not highly relevant to the 1997 sentence. Therefore, Liebzeit's brain damage, as it relates to the nature of the killing, cannot constitute a new factor.

¶30    Additionally, in terms of protection of the public and punishment, the circuit court explained during the 1997 sentencing:

> If we have a person who, over such trivial matters, can just take off and kill a person, what point in time can we actually predict when this person is going to be safe in society? Will it be when he's 50, will he not have this anger? Will it be when he's 60? I don't know that answer. Should the public be protected? I believe it should.
>
> Now, I don't know if there's any degree of punishment that can really be meted out to appropriately punish a person for the type of crime that occurred here. In this state, we have incarceration, that's the punishment we can mete out. Society needs to be protected from somebody who can murder [over] such trivial reasons.

The court added, "I don't know how one would begin to rehabilitate a person that has, inside of himself, such rage and anger that over such trivial matters, that they would kill a friend."

¶31    The circuit court's 1997 sentencing reveals that the court was focused on the gravity and nature of the killing, the need to protect the public, and

14

outright punishment. Due to these factors, the court found that Liebzeit could not be rehabilitated. While it might be true that "the impact that [brain] damage may have had on impulse control is relevant to whether [Liebzeit] is someone likely to be successfully rehabilitated," the court's sentencing explanation at that time reveals that Liebzeit's alleged issues with impulse control and rehabilitation were not highly relevant to the imposition of its original sentence. In other words, the court found at the 1997 sentencing that Liebzeit could not be rehabilitated—not because of his impulsive decision making—but because of the planning and brutality of the killing. Thus, the focus was on punishment and protection of society. Liebzeit's brain damage, as it relates to rehabilitation, was not a significant factor in the imposed sentence and therefore cannot constitute a new factor.

¶32     Sentence modification based on a new factor requires a high degree of relevance to the *imposition* of the original sentence—something Liebzeit fails to demonstrate by clear and convincing evidence. "The requirements for sentence modification are meant to 'promote[] the policy of finality of judgments [while at the same time] satisf[ying] the purpose of sentence modification, which is the correction of unjust sentences.'" ***Harbor***, 333 Wis. 2d 53, ¶51 (alterations in original; citation omitted). To allow the circuit court to modify Liebzeit's sentence based on the mere conclusion that his brain damage and alleged subsequent impulsivity were relevant to rehabilitation—when in 1997 it expressly found that the homicide was premeditated, that the public needed to be protected, and that Liebzeit could not be rehabilitated—would allow the court to "base a sentence modification on reflection and second thoughts alone." *See **id.***, ¶35.

15

## II. New scientific research on brain development in emerging adults does not constitute a new factor

¶33    The circuit court also modified Liebzeit's sentence based on new scientific research on brain development in emerging adults, which found that eighteen- to twenty-one-year-olds function closer to adolescents aged thirteen to seventeen than adults aged twenty-two to twenty-five.  Relying primarily on the Somerville Paper, the court found that current "neurological studies reveal that the human brain continues to develop beyond adolescence.  The brain grows in volume and becomes more organized into a person's mid-20s."[8]  Thus, the court concluded that Liebzeit's brain was likely not fully developed at the time he committed his crimes.

¶34    The State contends that any new scientific research on brain development in emerging adults cannot be considered a new factor under *State v. Ninham*, 2011 WI 33, 333 Wis. 2d 335, 797 N.W.2d 451, and *McDermott*.  Assuming without deciding that the new scientific research on brain development in emerging adults is highly relevant to Liebzeit's original sentence, we agree with the State that the research cannot constitute a new factor under Wisconsin precedent because the conclusions reached by the research were well known when Liebzeit was originally sentenced in 1997.

¶35    In *Ninham*, fourteen-year-old Ninham was convicted of first-degree intentional homicide for his "horrific and senseless" killing of a thirteen-year-old

---

[8] In particular, the Somerville Paper found that certain properties in the human brain make it more mature, and that those properties develop over time.  For example, "[l]ongitudinal studies … show that reductions of cortical gray matter and increases in white matter continue to actively change well into the twenties and that a point of stability emerges earlier in some brain structures than others."  Leah H. Somerville, *Searching for Signatures of Brain Maturity:  What Are We Searching For?*, 92 NEURON J. 1164, 1164 (2016) (citations omitted).

16

boy. *Ninham*, 333 Wis. 2d 335, ¶¶8-14, 23. Prior to sentencing, a PSI was produced that stated, among other things, that Ninham was a "serious substance abuser," who used cocaine and consumed alcohol daily. *Id.*, ¶25. At sentencing in 2000, the circuit court sentenced Ninham to life in prison without the possibility of parole on the intentional homicide conviction. *Id.*, ¶29. In imposing the sentence, the court cited the gravity of the offense, Ninham's character and culpability, and the need to protect the public. *Id.*, ¶¶30-31.

¶36 Years later, Ninham appealed, arguing, among other things, that new scientific research on brain development in emerging adults constituted a new factor for purposes of a sentence modification. *Id.*, ¶87. Specifically, Ninham cited

> magnetic resonance imaging (MRI) studies, apparently unavailable at the time Ninham was sentenced, which tend to show that the brain is not fully developed early in childhood and that making impulsive decisions and engaging in risky behavior is an inevitable part of adolescence. The studies further explain, according to Ninham, that as the brain matures, adolescents almost universally grow out of their impulsive and risky behavior. In addition, Ninham [pointed to] a growing body of research suggest[ing] that alcohol causes more damage to developing teenage brains than previously thought. According to Ninham, this new scientific research on adolescent brain development undermines the circuit court's findings regarding Ninham's culpability and recidivism.

*Id.* (footnote omitted).

¶37 On appeal, our supreme court concluded that Ninham failed to show by clear and convincing evidence that the new scientific research on brain development in emerging adults constituted a new factor. *Id.*, ¶91. The court assumed without deciding that the MRI studies were not in existence when

17

Ninham was sentenced, but it held that "the conclusions reached by the studies were already in existence and well reported by the time Ninham was sentenced in 2000." *Id.* In support of this proposition, the court cited *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (plurality opinion). In that case, the Supreme Court "referred to a 1978 report by a task force on sentencing young offenders to make clear that 'the Court ha[d] already endorsed' the proposition that juvenile offenders under the age of 16 are less culpable than adult offenders." *Ninham*, 333 Wis. 2d 335, ¶92 (alteration in original) (citing *Thompson*, 487 U.S. at 835).

¶38 Similar to *Ninham*, in *McDermott*, eighteen-year-old McDermott was found guilty of first-degree intentional homicide while possessing a dangerous weapon as a party to a crime. *McDermott*, 339 Wis. 2d 316, ¶2. At McDermott's sentencing in 1991, the circuit court characterized the killing as "a pre-planned premeditated execution," and it sentenced McDermott to life imprisonment with the possibility of parole in 2025. *Id.*, ¶¶2-3. Years later, McDermott filed a motion to modify his sentence based on a new factor. *Id.*, ¶1. McDermott argued that "recent research" demonstrated that "persons around the age of eighteen are not as mature as adults and, therefore, should not be held to the same degree of culpability as adults." *Id.*, ¶8. Without an evidentiary hearing, the court denied McDermott's motion to modify his 1991 sentence based on a new factor. *Id.*, ¶1.

¶39 On appeal, we affirmed the circuit court's decision, concluding that the new research did not constitute a new factor for two reasons. *Id.*, ¶17. First, under *Ninham*, "new scientific research regarding adolescent brain development" does not constitute a new factor. *McDermott*, 339 Wis. 2d 316, ¶18. Similar to *Ninham*, we held that the conclusions reached by the studies McDermott offered

18

were known when the circuit court sentenced him in 1991. *McDermott*, 339 Wis. 2d 316, ¶19.[9] Second, McDermott's proffered new research failed to constitute a new factor because the fact "that adolescents are generally more impulsive than adults has been known since humans were able to observe their environment." *Id.*, ¶20. We reasoned that, "[t]o say, as McDermott argues, that the trial court did not realize what recent scientific research has confirmed ignores reality, and, in essence, puts the old wine of human experience in the new bottles of recent research and labels the entire package as 'new.'" *Id.*, ¶21.

¶40 The circuit court in this case attempted to distinguish *Ninham* and *McDermott* at the hearing on Liebzeit's motion for sentence modification. The court concluded that those two cases did not prevent the court from concluding that the research cited by Liebzeit constituted a new factor because both cases were decided prior to a number of United States Supreme Court decisions, including *Miller v. Alabama*, 567 U.S. 460 (2012).[10] On appeal, Liebzeit echoes

---

[9] In further support of the fact that the studies' conclusions were well known in 1991, we also cited *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (plurality opinion), which stated:

> Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.

*State v. McDermott*, 2012 WI App 14, ¶19, 339 Wis. 2d 316, 810 N.W.2d 237 (quoting *Thompson*, 487 U.S. at 835).

[10] The circuit court further reasoned that *McDermott* and *State v. Ninham*, 2011 WI 33, 333 Wis. 2d 335, 797 N.W.2d 451, did not apply because the defendants in those cases presented "general research" only. Conversely, the court stated that "Liebzeit is presenting new studies specifically addressing persons between the ages of 18 and 22" and "research that fits his individual history."

(continued)

the court's analysis in this regard.[11]   Conversely, the State argues that the court erred in its analysis because *Ninham* and *McDermott* are consistent with recent United States Supreme Court precedent.

¶41     In *Miller*, the Supreme Court held that statutory sentencing schemes that mandate life in prison without the possibility of parole for juvenile offenders violate the Eighth Amendment.  *Miller*, 567 U.S. at 479.  *Miller* also requires sentencing courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.  Citing its recent decisions involving juveniles and the criminal justice system, the Court held that children are "constitutionally different from adults for purposes of sentencing … [b]ecause juveniles have diminished culpability and greater prospects for reform."  *Id.* at 471.  Namely, juveniles lack maturity and have an "'underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking."  *Id.* (citation omitted).  Further, "children

---

These considerations cited by the circuit court, however, go to the relevancy prong of the new factor analysis—in other words, whether the purported new factor was highly relevant to the imposition of the defendant's original sentence.  *See Ninham*, 333 Wis. 2d 335, ¶93.  Both *McDermott* and *Ninham* concluded on the second prong of the new factor analysis (*Ninham* concluded on both prongs)—in other words, whether the purported new factor was not known to the trial judge at the time of the original sentencing.  *See McDermott*, 339 Wis. 2d 316, ¶¶19-20; *Ninham*, 333 Wis. 2d 335, ¶¶91-92.  Further, as noted above, we assume without deciding that the new scientific research cited by Liebzeit is highly relevant to the imposition of his original sentence.  The issue is whether the conclusions drawn by that research were known at the time of the 1997 sentencing—thus, *McDermott* and *Ninham* both apply to this case.

[11]  The circuit court also cited *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (invalidating the death penalty for all juvenile offenders under age eighteen), and *Graham v. Florida*, 560 U.S. 48, 82 (2010) (invalidating life without parole sentences for juveniles convicted of non-homicide offenses).  In addition to *Miller v. Alabama*, 567 U.S. 460 (2012), *Roper* and *Graham*, Liebzeit cites *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016) (holding "that *Miller* announced a substantive rule of constitutional law"), to support this part of his analysis.

'are more vulnerable … to negative influences and outside pressures.'" *Id.* (alteration in original; citation omitted).

¶42 We agree with the State that *Ninham* is consistent with *Miller* and any other United States Supreme Court precedent relied on by the circuit court.[12] In fact, we addressed this issue in *State v. Barbeau*, 2016 WI App 51, ¶25, 370 Wis. 2d 736, 883 N.W.2d 520, and held that *Miller* does not alter the analysis in *Ninham*. We noted that *Miller* did "not consider [the] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles" and that "nothing in *Miller* undercuts our supreme court's holding in *Ninham*." *Barbeau*, 370 Wis. 2d 736, ¶32 (alteration in original) (quoting *Miller*, 567 U.S. at 479).

¶43 In sum, *Ninham* dictates that new scientific research on brain development in emerging adults regarding juveniles does not constitute a new factor warranting sentence modification, and that, under *McDermott*, the same science applied to eighteen- to twenty-two-year-olds does not constitute a new factor warranting sentence modification. We are bound by these two conclusions. *See Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).[13]

---

[12] We also note that Liebzeit was nineteen years old at the time of the killing, making him an adult and not a juvenile.

[13] Liebzeit also contends on appeal that the reasoning in *McDermott* does not apply because, in that case, McDermott was made eligible for parole eventually. Liebzeit asserts this difference is "an imperative factual distinction" because McDermott "was never deemed irretrievably incorrigible. His possible rehabilitation was never an issue." Here, according to Liebzeit, rehabilitation is an issue because his original sentence was with no possibility of parole, and the circuit court relied on the possibility of rehabilitation to modify his sentence.

(continued)

¶44    During Liebzeit's sentence modification hearing, the circuit court stated that the new scientific research on brain development in emerging adults demonstrates that "the human brain continues to develop beyond adolescence. The brain grows in volume and becomes more organized into a person's mid-20s." Specifically, the Somerville Paper, on which the court chiefly relied, stated that certain studies demonstrate that the brain "continue[s] to actively change well into the twenties and that a point of stability emerges earlier in some brain structures than others."    Leah H. Somerville, *Searching for Signatures of Brain Maturity: What Are We Searching For?*, 92 NEURON J. 1164, 1164 (2016).

¶45    Although the Somerville Paper was not in existence in 1997, "the conclusions reached … were already in existence and well reported" since at least 1988. *See **McDermott***, 339 Wis. 2d 316, ¶18 (quoting ***Ninham***, 333 Wis. 2d 335, ¶91).    This conclusion is well supported by Wisconsin precedent.    The new

---

We reject this argument.  First, ***McDermott***'s reasoning was taken from ***Ninham***.  In the latter, a fourteen-year-old defendant was sentenced to life in prison without the possibility of parole—the same sentence Liebzeit originally received in this case.  *See **Ninham***, 333 Wis. 2d 335, ¶2.  Second, and for the same reason explained previously, the new factor test in ***McDermott*** was not decided on relevancy grounds, but was instead decided on whether the research existed at the time the defendant was sentenced.  ***McDermott*** did not address whether the studies presented were highly relevant to the imposition of McDermott's sentence.  As stated earlier, we are assuming without deciding that the new science presented by Liebzeit is highly relevant to the imposition of his original sentence.

Lastly, Liebzeit attempts to distinguish ***McDermott*** and ***Ninham*** by pointing out that the circuit courts in those cases denied the defendants' motions to modify their respective sentences.  Liebzeit claims that this fact is "yet another critical factual distinction" because the circuit court in this case granted his motion.  Liebzeit fails to acknowledge that ***McDermott*** and ***Ninham*** were decided using the same legal standard in this case—in those cases, the courts never reached the discretionary step in the ***Harbor*** analysis and, therefore, the fact that the circuit courts denied the defendants' respective motions is of no significance.  *See **McDermott***, 339 Wis. 2d 316, ¶22 ("McDermott has not shown that the new research is a 'new factor' under the first aspect of ***Harbor***'s two-part analysis."); ***Ninham***, 333 Wis. 2d 335, ¶91 ("Ninham has not demonstrated by clear and convincing evidence that a new factor exists.").

scientific research on brain development in emerging adults in *Ninham* stated that "the brain is not fully developed early in childhood and that making impulsive decisions and engaging in risky behavior is an inevitable part of adolescence." *Ninham*, 333 Wis. 2d 335, ¶87. Likewise, in *McDermott*, the research provided that a person's brain is generally not through "adolescence … until a person's early 20s." *McDermott*, 339 Wis. 2d 316, ¶16. The three scientific conclusions essentially say the same thing—the human brain continues to develop past one's eighteenth birthday. As such, the circuit court erred by concluding that the new scientific research on brain development in emerging adults constituted a new factor for purposes of sentence modification.

   *By the Court.*—Order reversed.

   Not recommended for publication in the official reports.