COURT OF APPEALS
DECISION
DATED AND FILED

September 25, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2377-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CF95

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

AARON S. BARTH,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and order of the circuit court for Portage County: LYNDSEY A.B. BRUNETTE, Judge. *Affirmed*.

Before Kloppenburg, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Aaron S. Barth appeals a judgment of conviction and an order denying his motion for sentence modification based on six new factors. We conclude that the asserted factors do not meet the legal definition of a new factor for sentence modification either because they were not highly relevant to the circuit court's imposition of sentence or because they were known by the parties and the court at the time of sentencing. We therefore affirm.

## BACKGROUND

¶2 According to the complaint filed against him, Barth had an argument with his former girlfriend, B.C.,[1] at her house in Portage County on the morning of March 10, 2018. Barth pushed B.C. around the kitchen. He then caused the four-year-old child he shares with B.C. to fall into an end table and threw the seven-year-old child he shares with B.C. into a couch. He knocked B.C. down in a hallway and pushed her face into the floor before B.C. and both children went into a bedroom. Barth entered the bedroom, punched B.C., inserted a pair of scissors into her mouth, and prevented her and the children from leaving the bedroom. Eventually, realizing that police had been contacted, Barth left the house in B.C.'s vehicle.

¶3 Police located Barth while he was driving and attempted to stop him. Barth slowed down and backed into a driveway, but then drove around the police and accelerated away. An officer executed a pursuit intervention technique to stop the vehicle. Barth then slid into the backseat, refusing to exit the vehicle or comply with instructions from the police. When he finally did get out of the vehicle, Barth ran back to B.C.'s house and unsuccessfully attempted to get inside before running

---

[1] To protect the victim's privacy, we refer to her using initials that do not correspond to her own. *See* WIS. STAT. RULE 809.86(4) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

back to and getting into the vehicle. Police then physically removed Barth from the vehicle, tased him to get him to comply with their instructions, and arrested him.

¶4    In connection with this incident, the State charged Barth with false imprisonment with domestic abuse assessments, battery with domestic abuse assessments, disorderly conduct with domestic abuse assessments, attempting to flee or elude a traffic officer, resisting an officer, and two counts of physical abuse of a child. At the time of the incident, Barth was released on bond in three felony cases in three other counties and prohibited from committing any other crimes or acts of violence. Therefore, in addition to the seven counts listed above, he was charged with three counts of felony bail jumping in this case.

¶5    While this case was pending, the State charged Barth with crimes in several other Portage County cases. In April 2018, in Case No. 2018CF145, the State charged Barth with resisting an officer, felony possession of THC, and two counts of felony bail jumping as a result of an incident that took place outside of a bar when Barth's girlfriend reported being fearful of him. In March 2020, in Case No. 2020CF117, the State charged Barth with five counts of felony bail jumping for calling B.C. from jail earlier that month, alleging that this contact violated the terms of bond in five pending felony cases. In May 2020, in Case No. 2020CF170, the State charged Barth with one count of felony bail jumping for calling B.C. from jail in March 2018, a few days after he was arrested for the March 10 incident in her house underlying this case. Finally, later in May 2020, in Case No. 2020CM149, the State charged Barth with one count of disorderly conduct with domestic abuse assessments for a 2017 incident in which he allegedly assaulted B.C.

¶6    Barth entered a plea agreement to resolve the charges in this case and the other Portage County cases. Barth agreed to plead no contest to the charges of

false imprisonment, battery, fleeing or eluding an officer, and one count of bail jumping in this case. In exchange, the State agreed to dismiss and read in the six remaining counts in this case and the eleven counts in the other cases.[2] The parties agreed to recommend a sentence of three years of initial confinement followed by three years of extended supervision for the false imprisonment charge, nine months of imprisonment on the battery charge, and withheld sentences on the fleeing or eluding and bail-jumping charges. They further agreed to recommend that this sentence be served concurrent to sentences Barth was serving in two out-of-county cases. The circuit court accepted Barth's pleas and ordered a presentence investigation (PSI) report before sentencing.

¶7      The PSI report described Barth's criminal history, which, in addition to the cases already described, included 18 criminal cases between 2004 and 2020 in which Barth was convicted of offenses or charges were dismissed and read in at sentencing. The record included convictions for resisting or obstructing an officer, escape while under extended supervision, bail jumping, battery with domestic abuse assessments, and disorderly conduct. The PSI report also discussed Barth's "extensive mental health history," which included diagnoses and treatment for depression, anxiety, paranoia, psychotic symptoms, attention deficit hyperactivity disorder, and severe cannabis use disorder, and reflected treatment including multiple medications and admissions to treatment facilities.

¶8      At Barth's sentencing, B.C. made an in-court statement and asked the circuit court to "give [Barth] the harshest punishment for the crimes that he has committed." After providing an account of many acts of abuse that Barth inflicted

---

[2] The State also agreed to dismiss and read in all charges in several then-pending traffic cases.

on her and her children, B.C. stated that Barth had called her several days before the sentencing hearing and attempted to bribe her to say that she made up the allegations against him. The State informed the court that it had recently charged Barth with felony intimidation of a witness and bail jumping for this attempt to contact B.C. and "dissuade her from coming in and speaking truthfully to the court," noting that that case was "not a part of this disposition" and "will be prosecuted separately."[3]

¶9      Barth then exercised his right to allocution. He apologized for his past actions. He said that on March 10, 2018, the day that the incident underlying this case occurred, he hadn't yet taken the medications he has "to help [him] with these type of situations." He said that "[a] lot of things that are said about [him] and [his] character are hearsay from an individual that is hurt and in a lot of pain because I left her to be with another woman" and further stated that he had "messages supporting" alleged threats by B.C. to call his probation officer if he did not do what B.C. demanded. He accused B.C. of "taking the kids" from him and again mentioned "messages" from her, including one in which she threatened that he would never "see the kids ever again as long as [he is] with [his new significant other]." Finally, Barth stated that he "get[s] bad anxiety and depression and PTSD from [B.C.]" and is "on medication for that, as well," before saying that he would not "blame somebody for [his] illnesses."

¶10      The circuit court imposed a sentence longer than that jointly recommended by the parties: three years of initial confinement and three years of extended supervision on the false imprisonment count, consecutive to any other sentence; nine months of incarceration on the battery count, to run concurrent to the

---

[3] Barth was eventually convicted of intimidating a victim for this incident in Portage County Circuit Court Case No. 2020CF417.

false imprisonment count; one-and-one-half years of initial confinement followed by two years of extended supervision on the fleeing or eluding count, to run consecutive to the false imprisonment count and any other sentences; and one year of initial confinement followed by one year of extended supervision on the bail-jumping count, to run consecutive to all other counts and any other sentences.

¶11    The circuit court explained this sentence by reviewing the four charges to which Barth pled in this case, which it viewed as "serious" and "very scary" for B.C. and the children. The court also referenced the "host of charges dismissed and read in," which "are factors that the court considers … in crafting an appropriate sentence." It acknowledged the "mental health needs" reflected in the PSI report, but determined that mental health issues did not excuse Barth's conduct. The court made clear that it was not impressed by Barth's allocution, commenting that it was "probably one of the more significant" examples of "victim blaming" it had heard. It further stated that it did not "need somebody else's statements" to tell it that Barth had a disregard for the law, because that disregard was evident from Barth's actions based on the charges to which he pled and his "[o]ngoing communication with the victim."

¶12    The circuit court also discussed the well-established ***Gallion*** sentencing factors. *See **State v. Gallion***, 2004 WI 42, ¶25, 270 Wis. 2d 535, 678 N.W.2d 197 (stating the well-established concept that probation should be imposed unless the sentencing court finds that incarceration is necessary for public protection, for the offender's correctional treatment, or to avoid depreciating the seriousness of the offense). With respect to the need to protect the public, the court noted that Barth's current partner was a victim in the dismissed and read-in charges from Portage County Case No. 2018CF145 and that the PSI report reflected a long history of failure to comply with supervision conditions, including absconding. The

court further stated its determination that "the only way to ensure that [Barth would] get … treatment" would be "in a confined setting."

¶13 Approximately two-and-one-half years after his sentencing, Barth filed a motion for sentence modification. He asserted that multiple new factors warranted a new sentence in his case: (1) misinformation related to six read-in counts of bail jumping; (2) misinformation about the new charges filed against Barth several days before sentencing; (3) information about Barth's mental health at the time of the offenses and current treatment; (4) information about B.C.'s interactions with Barth while the case was pending; (5) information about B.C.'s character and dishonesty; and (6) information about B.C.'s contacts with Barth after sentencing.[4]

¶14 The State argued that none of the asserted new factors, other than the first two, were arguably new factors because they were known to the parties and the sentencing court at the time of sentencing. With respect to the first asserted new factor, the State conceded that Barth was not subject to bond when he made the calls to B.C. from jail that resulted in him being charged with six of the read-in counts of bail jumping. Thus, the State agreed that this asserted new factor "was unknowingly overlooked by the parties and the court at the original sentencing," and could justify modification of Barth's sentence if deemed highly relevant to the imposed sentence. Similarly, with respect to the second asserted new factor, the State agreed that it had incorrectly charged Barth with bail jumping based on Barth's call to B.C. from jail several days before sentencing. Therefore, it conceded, its reference to that charge

---

[4] Barth also asserted that information about B.C.'s false accusations against him after he withdrew his plea in a related case was a new factor warranting sentence modification, but he does not renew this argument on appeal.

at the sentencing hearing, if deemed highly relevant to the imposed sentence, could be a new factor.

¶15 Out of "an abundance of caution," and in light of the parties' stipulation that the dismissed and read-in charges of bail jumping were improperly charged in Portage County Case Nos. 2020CF117 and 2020CF170, the circuit court conducted a hearing on Barth's motion. The court accepted into evidence records of Barth's presentencing mental health treatment and various messages between Barth, B.C., and Barth's girlfriend both before and after sentencing. In its written order, the court denied Barth's motion, concluding that the six wrongfully charged bail-jumping counts that were dismissed and read in "were not highly relevant to the imposition of sentence" and that none of the other facts or arguments Barth relied on were new factors.

¶16 Barth appeals.

## DISCUSSION

¶17 "A court cannot base a sentence modification on reflection and second thoughts alone." *State v. Harbor*, 2011 WI 28, ¶35, 333 Wis. 2d 53, 797 N.W.2d 828. However, circuit courts do have inherent authority to modify a criminal sentence when (1) a defendant shows that there is a "new factor," and (2) the court determines that the new factor justifies modification. *Id.*, ¶¶35-37. A "new factor" is "'a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.'" *Id.*, ¶40 (quoting *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975)).

8

¶18    We review de novo the legal question of whether a new factor exists. ***State v. Vaughn***, 2012 WI App 129, ¶35, 344 Wis. 2d 764, 823 N.W.2d 543. "'The defendant has the burden to demonstrate by clear and convincing evidence the existence of a new factor.'" ***Id.*** (quoting ***Harbor***, 333 Wis. 2d 53, ¶36). Whether a new factor justifies sentence modification is within the circuit court's discretion, and we review the court's decision for an erroneous exercise of discretion. ***Vaughn***, 344 Wis. 2d 764, ¶35.

¶19    Here, Barth renews his assertion that there are six new factors that justify modification of his sentence and that the circuit court erred in concluding that he had not established a new factor for sentence modification. We will discuss the asserted new factors in three categories: first, those related to misinformation about bail-jumping charges; second, the asserted factor related to Barth's mental health; and finally, those related to B.C.'s character and conduct.

## I. Misinformation About Bail-Jumping Charges

¶20    Barth's first two asserted new factors relate to the circuit court's understanding that Barth was facing seven counts of bail jumping that were, in fact, wrongfully charged. The State concedes that the combined six counts of felony bail jumping in Portage County Case Nos. 2020CF117 and 2020CF170 were wrongfully charged; Barth placed the calls to B.C. leading to those charges from jail, not while released on bond such that the calls could be violations of his bond conditions. *See* WIS. STAT. § 946.49 (defining bail jumping as intentionally failing to comply with terms of bond while "having been released from custody under [WIS. STAT.] ch. 969"). Similarly, with respect to the State's comment at sentencing that Barth had been charged with both intimidating a witness and bail jumping for his call to B.C. a few days prior to sentencing, the State concedes that call was also placed

from jail and did not support a charge of bail jumping. Barth argues that the court incorrectly analyzed whether the "falsely inflat[ed] … number of times Mr. Barth had committed bail jumping offenses" was a new factor as a matter of law.

¶21 The State agrees that the fact that Barth was improperly charged in these cases was not known at the time of sentencing. In that sense, that fact was "new." But the State contests that the wrongfully charged bail-jumping counts were "highly relevant" to the circuit court's sentence. We agree that the evidence does not support a conclusion that any of these wrongfully charged bail-jumping counts were highly relevant to sentencing, so they are not "new factors" as a matter of law.

¶22 None of the evidence Barth relies on persuades this court that these improperly charged bail-jumping counts were highly relevant to his sentence. First, with respect to the six improperly read-in charges, he points to the circuit court's statement at sentencing that it was considering the "host of charges dismissed and read in." As Barth points out, the court stated that the read-in charges showed his "complete disregard for the law, especially court orders." However, there were eleven other properly charged counts that were dismissed and read in for sentencing, including four bail-jumping counts. Those counts, the extensive criminal history reflected in Barth's PSI—which shows multiple charges of bail jumping and one conviction for absconding from supervision—and the bail-jumping count to which Barth pled no contest in this case all strongly support the court's finding that Barth had a disregard for the law and court orders. The court did not discuss these six particular read-in charges specifically as part of its consideration of Barth's criminal history.

¶23 However, the circuit court understood that these six charges were based on Barth placing calls to B.C. after he battered her. Barth does not contest

that he persisted in calling B.C. after the incident underlying this case. The court noted that behavior—Barth's "ongoing communication with the victim"—as something separate from the read-in charges that showed Barth's attitude that he was "above" the law.

¶24 Barth also asserts that the State's mention of the final improperly charged count of bail jumping at sentencing—stemming from Barth's call attempting bribery just days before sentencing—"added to the [circuit] court's negative impression" of his "ability to follow rules and his general culpability." Again, we disagree that this establishes the "highly relevant" nature of the factor. The State expressly stated that that charge was "not a part of this disposition," and the court did not refer to the incident at all during sentencing. Moreover, as with the other improperly charged counts, the conduct underlying the wrongful charge, which led to a conviction for witness intimidation, is not disputed.

¶25 Finally, Barth argues that the circuit court made an error of law when it misapplied the test for a new factor in deciding his postconviction motion. He relies on the court's statement that "the parties agree that [the wrongfully charged bail-jumping counts are] a new factor, and the court agrees after the motion hearings and briefings," which the court made before deciding whether the wrongful charges were highly relevant to sentencing. Barth correctly points out that the highly relevant analysis is *part* of the new factor question itself, and that once the existence of a new factor is established, the next step is to decide whether sentence modification is warranted.

¶26 We agree that the circuit court was imprecise in articulating the new factor analysis in this instance. But it is clear in context that the parties (and the court) agreed that all of the improperly charged bail-jumping counts constituted new

*information* in the sense that the information about the propriety of these charges was not known at sentencing, and that the court simply—and properly—looked to the other component of the legal definition of a new factor: whether the information was highly relevant to sentencing. The court concluded, as this court does, that the improperly charged counts of bail jumping were not highly relevant to Barth's sentence. In the context of the factors influencing Barth's sentence, the record shows that the improperly charged bail-jumping counts had very little, if any, discernible impact on his sentence. We see no error in the court's decision denying Barth's postconviction motion with respect to the asserted new factors of improper bail-jumping charges.

## II. Barth's Mental Health

¶27 Next, Barth argues that the extent of his mental health issues and his positive response to postconviction treatment constitute a new factor for sentence modification. He asserts that after committing the offenses in this case, he "recognized that he needed help," finally "received the treatment he needed," and "found a combination of medications that worked for him," which demonstrates that at sentencing, he was simply explaining his mental health struggles the best he could—not making an excuse, as he says the circuit court seemed to conclude. He further argues that his rehabilitation casts his previously known mental health issues in a new light, showing that they were more serious than anyone appreciated at the time. Therefore, he asserts, "his mental health at the time of these offenses should be taken as a mitigating factor."

¶28 We disagree that the information related to Barth's mental health constitutes a new factor. First, as the State points out, it is well established that an inmate's progress or improvement in mental health while incarcerated is not a new

factor. *See State v. McDermott*, 2012 WI App 14, ¶15, 339 Wis. 2d 316, 810 N.W.2d 237 (inmate's post-sentencing rehabilitation is not a new factor); *State v. Prince*, 147 Wis. 2d 134, 136-37, 432 N.W.2d 646 (Ct. App. 1988) (same). Second, both Barth and the PSI report writer were aware of Barth's mental health issues, including diagnoses and treatment, at sentencing. Indeed, the PSI report refers to "an extensive mental health history" evidenced by nineteen pages of documentation from Barth and additional documentation provided by two institutions at which Barth received treatment on multiple occasions. The PSI report appears to describe in detail the same information reflected in the records that Barth introduced in the circuit court at the hearing on his postconviction motion.

¶29 In addition, Barth himself told the circuit court he suffered from "anxiety and depression" and that he was "on medication" for his mental illnesses during allocution. The court acknowledged that Barth "clearly ha[d] some mental health needs," referring specifically to the PSI report in this regard. While Barth clearly wishes the court had treated his mental health issues as more of a mitigating factor at sentencing, he has not demonstrated that these issues were "'unknowingly overlooked by all of the parties.'" *See Harbor*, 333 Wis. 2d 53, ¶40 (quoted source omitted). His assertion that his successful postconviction treatment provides new information regarding the extent of his previously known mental health challenges, transforming them into a new factor, seems to be an "'I am now rehabilitated' argument in slightly different clothes" of the sort we have consistently rejected. *See McDermott*, 339 Wis. 2d 316, ¶15. The court did not err in denying Barth's postconviction motion with respect to this asserted new factor.

### III. B.C.'s Character and Behavior

¶30    Barth's final three asserted new factors relate to B.C.'s character and behavior.  First, he argues that B.C.'s presentencing conduct, including sending many text messages to both Barth and his girlfriend, is a new factor.  He contends that B.C.'s threatening messages, in which she expressed "discontent about [her] romantic relationship" with Barth and made various demands of him, show that he was not "victim-blaming" during his allocution but rather providing the court with the context necessary to understand the interactions between him and B.C.

¶31    These messages were not "'unknowingly overlooked by all of the parties'" at sentencing.  *See Harbor*, 333 Wis. 2d 53, ¶40 (quoted source omitted).  Barth knew of the messages; he described some of B.C.'s allegedly threatening text messages during his allocution, saying "she is taking the kids from me.  I have messages."  In addition, the PSI report states that, "[u]nprompted[,] [Barth] began the interview with [the PSI] writer by providing approximately (32) thirty-two pages of screen shots and printed electronic documentation that he stated shows [B.C.'s] volatile attitude toward him."

¶32    Nor was B.C.'s behavior, as reflected in these presentencing messages, highly relevant to Barth's sentence.  *See id.* (defining "new factor" as a fact or facts "'highly relevant to the imposition of sentence'" (quoted source omitted)).  To the extent the messages cast B.C.'s victim impact statement in a new light, it is clear that the statement was not particularly important to the circuit court's analysis.  The court expressly stated: "I don't need somebody else's statements whether it is a probation agent or a victim to tell me that you have a disregard for the law, because it is clear, based on the charges you have pled to, that you do."  In other words, the court made clear that it was sentencing Barth based on *his*

conduct—regardless of B.C.'s conduct and any part that she did or did not play in making the relationship violent.

¶33 Second, Barth asserts that evidence of B.C.'s dishonesty in a court proceeding after his sentencing, specifically a perjury charge she faced in connection with her testimony in another matter involving Barth and his girlfriend, is a new factor. Again, Barth does not demonstrate that B.C.'s credibility was "highly relevant" to his sentence. *See id.* To the contrary, the circuit court made clear that it was sentencing Barth for *his* conduct while considering the *Gallion* factors, rather than basing the sentence on B.C.'s statements.

¶34 Finally, Barth asserts that B.C.'s continuing contact with him after sentencing constitutes a new factor. He argues that B.C.'s postsentencing contact with him and his girlfriend, evidenced by her text messages demanding that they edit social media posts, among other things, constitutes a new factor because the circuit court "relied on her [victim impact] statement in determining its view of [Barth's] character." Barth cites no evidence for this contention other than the court's focus on "Barth's allocution, his ability to be in domestic relationships, and his respect for others and the law." Again, as stated in the discussion of B.C.'s presentencing messages, there is no evidence that the court relied on B.C.'s victim impact statement in determining Barth's sentence, and we are not persuaded that these postsentencing messages show anything highly relevant to the imposition of sentence. Simply put, they do not do anything to diminish the severity of Barth's crimes to which he pled no contest, nor do they affect the other *Gallion* factors which the court appropriately considered in imposing sentence.

¶35 Barth has failed to establish that any of the asserted new factors relating to B.C.'s character and behavior constitute new factors.

**CONCLUSION**

¶36    We conclude as a matter of law that Barth has failed to demonstrate the existence of any new factors justifying modification of his sentence. Therefore, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.